Randall R. DAVIS, Appellant–Petitioner,

v.

M. Brian DAVIS, Individually and as Trustee of the Trust of Maybelle V. Reichert, dated August 5, 1996, Appellee–Respondent.

No. 82A01–0706–CV–262.

Court of Appeals of Indiana.

June 30, 2008.

Jeff Shoulders, Barber & Shoulders, Evansville, IN, Attorney for Appellant.

Catherine A. Nestrick, Donald J. Fuchs, Bamberger, Foreman, Oswald and Hahn, LLP, Evansville, IN, Attorneys for Appellee.

## OPINION

KIRSCH, Judge.

Randall R. Davis ("Randall"), a beneficiary of a trust established by his mother, Maybelle V. Reichert ("Reichert"), filed a petition to have his brother, M. Brian Davis ("Brian" or the "Trustee"), removed as the trustee of the trust. The trial court denied Randall's petition. Randall appeals raising the following restated issues for our review:

I.  Whether the trial court abused its discretion in finding that Brian's actions did not warrant his removal as the trustee of the Trust.

II. Whether the trial court erred in setting the interest rate at 4.5% for the Trustee's repayment of loans despite expert testimony that the applicable rate during that time period was 8%.

III. Whether the trial court erred in reducing Randall's attorney fee award from his requested $29,628.69 to $4,000.00.

We reverse and remand.

## FACTS AND PROCEDURAL HISTORY

Reichert, as Trustor, established the "Trust of Maybelle V. Reichert (Revocable)" on August 5, 1996 ("Trust"). *Appellant's App. Vol. 3* at 124.[1] Reichert had three children, two of whom are involved in this litigation. Randall, who resides in Texas and also had three children, was Reichert's oldest child and a beneficiary of the Trust. *Tr.* at 62. Brian, who resides in Evansville, was Reichert's youngest son and was both the trustee and a beneficiary of the Trust. Reichert's third son, Donald, who is not mentioned in the Trust, had four children. *Id.*

Under the terms of the Trust, Reichert was the sole beneficiary with unlimited rights to all principal and income during her lifetime. *Appellant's App. Vol. 3* at 124. The original Trust assets consisted of only two pieces of property—(1) "Lot sixteen (16) in Green River Estates ..." (4646 English Way, Evansville, Indiana);

and (2) "The East 5 feet of Lot 11 and all of Lots 12, 13 and 14 in Block 4 in Legler Heights ..." (2323 E. Gum Street, Evansville, Indiana). *Id.* at 144. Reichert's United Fidelity Bank accounts, no. 0854 ("Operating Account") and no. 4916 ("Savings Account"), were not included as part of the original Trust property. However, the Trustee opened these accounts in the Trust's name on August 6, 1996—the day after Reichert created the Trust. *Id.* at 168–69. Also in August 1996, Reichert named Brian to be her power of attorney and health care representative.[2] *Tr.* at 122. Brian testified that he provided his mother with annual statements of the Trust during her lifetime. *Id.* at 33.

On December 27, 1996, five years prior to Reichert's death, the Trustee paid each of his two children a $10,000.00 gift from the Trust's Operating Account. *Appellant's App. Vol. 3* at 176. Two months later, the Trustee paid his two children a second gift of $10,000.00 from the Operating Account. In May 1997, the Trustee gave himself a gift of $10,000.00 from the Trust's Operating Account. The Trustee made no gift from the Trust to Randall or any of his three children.

1. The manner in which the record before us was compiled makes succinct citation difficult. The Appellant has submitted a three-volume appendix. Volume 1 contains three tabs. Tab A is the docket sheet, which is numbered page 1 through page 9. Tab B is the trial court's Amended Findings of Fact and Conclusions of Law and begins its pagination anew—running from page 1 through page 17. Tab C again begins with page 1 and runs through page 344. Our citation is further complicated because, although the pagination of tab C is consecutive, the nonpublic pages (printed on green paper) have been pulled out of their collated order and bound separately in volume 3. Volumes 1 and 2 contain the public documents but, due to the removal of the nonpublic documents, each page may not seem sequential. Likewise, volume 3, which contains all of the nonpublic documents, appears non-sequential due to the public documents being bound in the first two volumes. The exhibits are also difficult to navigate because the page numbers refer only to the cover page of each exhibit. Therefore, while there are three volumes of exhibits, the table of contents references pages 1 through 43. Exhibits 1 through 7 are found in Volume I, Exhibit 8 in Volume II, and the remaining exhibits are in Volume III.

2. We are unable to find documentation relating to Brian being appointed Reichert's power of attorney or health care representative; however, the Trustee testified that Reichert made him power of attorney and health care representative in August of 1996. *Tr.* at 122.

On April 30, 1997, the Trustee loaned $36,000.00 from the Trust's Savings Account to himself, $30,000.00 of which he repaid the next day without interest. Later that same year, the Trustee loaned himself $3,000.00 from the Trust's Operating Account. He repaid the $3,000.00 three weeks later with interest in the amount of $6.98.

During this time in 1997, the Trustee was Vice Chairman of United Fidelity Bank ("Bank"), and was President, Chief Executive Officer, Director, and Vice Chairman of the Bank's holding company, Fidelity Federal Bancorp. *Appellant's Br.* at 3. In September of that year, the Bank's board of directors decided to raise additional capital to enhance the Bank's business plan because the Bank's earnings were down from the previous year. *Tr.* at 216. On September 30, 1997, the Trustee paid $85,866.54 from the Trust's Operating Account for 22,017 shares of stock in the Bank ($3.90 per share). *Tr.* at 39, 218–23. The price of the shares was established by warrants, i.e. stock options, that Reichert received in 1994 and 1995 as a stockholder of the Bank. *Id.* at 36. At the time of Reichert's death, the Bank's stock was worth $1.31 to $1.81 per share.

In 1998 and 1999, the Trustee paid, from the Savings Account, a gift to himself and one to Randall in the amount of $10,000.00 each. In November 1999, the Trustee also made a loan from the Trust's Savings Account to himself in the amount of $25,000.00.

Reichert became afflicted with Alzheimer's disease and cancer, and by June 2000, she was unable to care for herself. At that time, the Trustee moved Reichert into a separate living area within his home. Reichert died on February 13, 2001. Two months after Reichert's death, Randall's attorney, Edward Johnson, sent a letter to Donald Fuchs, the attorney for the Trustee, requesting a copy of the Trust's checking, savings, and investment accounts. *Pl.'s Ex.* 19. Having received no response, Johnson sent Fuchs a follow-up letter and made the same request in August 2001. *Pl.'s Ex.* 20. Yet a third time, on January 24, 2002, Johnson sent a letter to Fuchs requesting a "current accounting" for the Trust. *Id.*

On February 20, 2002, Randall filed a "Petition to Docket Trust for Accounting" alleging that the Trustee had failed, for more than a year, to provide Randall with any record of the Trust. *Pl.'s Ex.* 11. The Trustee filed an answer claiming that he had, and would, continue to make all financial information pertaining to the Trust available for Randall's inspection. *Pl.'s Ex.* 12. During February and March 2003, Johnson sent Fuchs three additional letters inquiring about the Trustee's progress in gathering the requested financial information about the Trust. *Pl.'s Ex.* 20.

Having received no response from Fuchs or the Trustee, on July 29, 2003, Randall filed "Petition to Request an Accounting." *Pl.'s Ex.* 18. A year later and more than three and a half years after the initial request, on November 17, 2004, the Trustee filed "Trustee's Intermediate Accounting and Report," which itemized transactions from the years 2000 through 2004. *Pl.'s Ex.* 13. On December 1, 2004, Randall filed an "Objection to Accounting" and raised the following issues: (1) the Trustee had withdrawn $36,000.00 from the Trust on or about April 30, 1997; (2) the Trustee had failed to repay a $25,000.00 loan paid from the Trust account; (3) the Trustee had paid each of his two children $10,000.00 from Trust money in each of two successive years, but gave nothing to Reichert's other grandchildren; and (4) the proceeds from the Integra Trust—a trust created by Reichert's mother—were delivered to Reichert prior to

December 31, 1999. *Pl.'s Ex.* 14. Randall also asserted that the accounting was incomplete and asked the trial court to order an accounting that commenced in August 1996. *Id.*

On August 17, 2005, the Trustee filed a second intermediate accounting and report, which again began with the year 2000. *Pl.'s Ex.* 15. Randall filed an objection to this accounting on September 2, 2005. *Pl's Ex.* 16. Three months later, the Trustee filed a Supplement to Trustee's Intermediate Accounting and Report. *Pl.'s Ex.* 17. This third accounting added the named payee for each disbursement, but still showed no accounting for the period from 1996 through 1999. Randall filed a supplemental objection to the accounting on May 10, 2006. *Appellant's App. Vol. 1* tab A at 6.

Finally, on July 7, 2006, five years after Reichert's death, the Trustee filed a supplemental and amended intermediate accounting and report. *Pl.'s Ex.* 8. For the first time, this accounting revealed missing Trust transactions for the years 1996 through 1999. The Trustee later testified that this was the first time he discovered that the loans made from the Trust to himself had not been repaid. *Tr.* at 124. This accounting also revealed that the Trustee had made deposits to the Trust from unnamed sources and that funds from another trust had been commingled with the assets of the Trust. *Id.* at 106, 131–36, 174–75, 182–83. The Trustee testified, "I erred in not . . . in not keeping a more accurate deposit history." *Id.* at 175.

The Trustee's failure to repay the money he borrowed from the Trust was discovered by Randall's accountant, Steven Brackmann. *Id.* at 328. In his review of the accounting, Brackmann also discovered missing checks and deposits made to the Trust without explanation. Randall was charged fees in the amount of $19,273.58

for the accounting services of Brackmann and two prior accountants, all of who took some part in the review of the Trust's finances. *Id.* at 313–14, 331–34, 366–69.

On June 29, 2006, just one week prior to filing the fourth accounting, the Trustee repaid the Trust $6,000.00. This sum represented the Trustee's deficiency on the $36,000.00 loan the Trustee had made to himself on April 30, 1997. This money was repaid without interest.

Randall filed objections to the Trustee's July 7, 2006 accounting, and the trial court set a hearing date. *Appellant's App. Vol. 1 tab C* at 190. On January 24, 2007, Randall also filed a petition to remove Brian as Trustee on the grounds that the Trustee: (1) had co-mingled funds from this trust with funds from another trust; (2) had engaged in self-dealing; (3) had failed to keep appropriate Trust records; and (4) had and continues to have a conflict of interest. *Id.* at 201.

Prior to the hearing, the Trustee repaid the Trust $39,415.62 on January 17, 2007. *Appellant's App. Vol. 3* at 203–04. This payment represented the following:

1.  Loan of November 29, 1999, in the amount of $25,000 with interest [at the rate of 4.5%] from that date in the amount of $8,020.32 ($33,020.323)

2.  Overdraft fees charged by United Fidelity Bank ($203.00)

3.  Research fees charged by United Fidelity Bank ($476.00)

4.  Legal fees paid by the Trust to Bamberger, Foreman, Oswald and Hahn, LLP for services pertaining to Davis Brothers Properties, LLC.

5.  May 2001 real estate tax installment for 4646 English Way, Evansville, Indiana.

6.  Fees paid . . . for lawn maintenance services on 4646 English Way . . .

subsequent to the death of [Reichert].

7. Homeowners insurance premium on 4646 English Way ... paid subsequent to the death of [Reichert]. . . .

*Id.* The Trustee and Fuchs set the interest rate at 4.5% for the loans. *Tr.* at 177–78.

In February 2007, the trial court held a two-day hearing to review the Trustee's interim accountings, Randall's objections thereto, Randall's petition to remove Brian as the Trustee, and to address the issue of Randall's request for attorney fees in the amount of $29,628.69. *Appellant's App. Vol. 2* at 324–44. Following the hearing, the trial court entered amended findings of fact and conclusions, which: 1) denied Randall's request to remove Brian as the Trustee; 2) ordered the Trustee to pay interest in the amount of 4.5% on loans totaling $39,000.00, which had been made from the Trust to the Trustee; and 3) reimbursed Randall for $4,000 in legal services, instead of Randall's requested $29,628.69. *Appellant's App. Vol. 1 tab B* at 15–16. Randall now appeals. Additional facts will be added as necessary.

## DISCUSSION AND DECISION

When, as here, a trial court enters findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A), we apply a two-tiered standard of review; first, we determine whether the evidence supports the findings, and second, whether the findings support the judgment. *Supervised Estate of Allender v. Allender,* 833 N.E.2d 529, 533 (Ind.Ct.App.2005), *trans. denied; Goodwine v. Goodwine,* 819 N.E.2d 824, 828 (Ind.Ct.App.2004); *Freese v. Burns,* 771 N.E.2d 697, 700–01 (Ind.Ct. App.2002), *trans. denied.* In deference to the trial court's proximity to the issues, we disturb the judgment only where there

is no evidence supporting the findings or the findings fail to support the judgment. *Allender,* 833 N.E.2d at 533. We do not reweigh the evidence, but consider only the evidence favorable to the trial court's judgment. *Id.* Challengers must establish that the trial court's findings are clearly erroneous. *Id.* Findings are clearly erroneous when a review of the record leaves us firmly convinced that a mistake has been made. *Id.* We do not defer to conclusions of law, however, and evaluate them *de novo. Id.*

### I. Removal of the Trustee

Randall first contends that the trial court abused its discretion in finding that Brian's actions did not warrant his removal as the trustee of the Trust. We agree. A court's power to remove a trustee is set forth in IC 30–4–3–29. The language of the statute reveals that the power is discretionary, since the "trustee *may* be removed by the court." IC 30–4–3–29(a) (emphasis added); *see In re Brown,* 436 N.E.2d 877, 884 (Ind.Ct.App.1982). This section, however, does not prescribe when the court should exercise such power. *In re Brown,* 436 N.E.2d at 884.

Indiana enacted IC 30–4 (the "Trust Code") to govern trusts in Indiana. The Trust Code sets forth rules to create, govern, and administer a trust. Specifically, it defines the rights, powers, duties, liabilities, and remedies of the parties to the trust, IC 30–4–3, and provides the trustee with guidelines for administering the trust. IC 30–4–5.

A trust is a fiduciary relationship between a person who, as trustee, holds title to property and another person for whom, as beneficiary, the title is held. IC 30–4–1–1(a).[3] A "breach of trust" is a violation by the trustee of any duty that is owed to the beneficiary. IC 30–4–1–2(4). These

3. IC 30–4–1–1(b) allows a person to be both the trustee and a beneficiary.

duties are established both by statute and by the terms of a trust. The statutory duties, in pertinent part, include: keeping the trust property separate from the trustee's individual property and separate from or clearly identifiable from property subject to another trust; maintaining clear and accurate accounts with respect to the trust estate; and giving the beneficiary complete and accurate information concerning any matter related to the administration of the trust. IC 30–4–3–6(b).[4]

A trustee also owes its beneficiaries a duty of accounting, which requires the trustee to deliver a written statement of the accounts to each income beneficiary annually. IC 30–4–5–12(a). The statement, at a minimum, must contain "all receipts and disbursements since the last statement" and "all items of trust property held by the trustee on the date of the statement at their inventory value." *Id.*

In general, a trustee may not exercise a power that conflicts with the trustee's individual interests. IC 30–4–3–5. Further, a trustee has a duty:

(1) not to loan funds to the trustee or an affiliate;

(2) not to purchase or participate in the purchase of trust property from the trust for the trustee's own or an affiliate's account;

(3) not to sell or participate in the sale of the trustee's own or an affiliate's property to the trust; . . . .

IC 30–4–3–7(a).

Here, the Trust provided that, during Reichert's lifetime, the Trustee must pay all of the net income and corpus of the Trust as Reichert may direct. *Appellant's App. Vol. 3* at 124. In the event of Reic-

hert's incapacitation through illness, age, or other cause, such incapacity had to be certified to by a doctor, and thereafter, the Trustee was required to pay the expenses of Reichert's care. *Id.* at 125. Article I also provided the Trustee with discretion to make gifts to Reichert's children and grandchildren in such amount as shall be allowed by the Internal Revenue Code's annual exclusion. *Id.* Such gifts were to be given in the Trustee's "sole discretion" and "his decision in such matters [was to] be final and binding on all future beneficiaries of any trust that may come into existence under [the Trust]." *Id.*

Article II of the Trust provided:

It is recognized by the Trustor that upon the death of the Trustor, that this trust will either terminate or be separated into separate trusts. Nevertheless, this trust shall continue in existence in order to receive any assets from the Trustor's probate estate under the terms of the Last Will and Testament of the Trustor. . . . In recognition of the foregoing, the Trustee may postpone the distribution of all or any part of the trust assets until the payments [of debts, expenses, and taxes] have been made, but *distribution of the assets of this Trust shall not be delayed for more than two (2) years after the death of the Trustor, or at such later time as the federal estate taxes and state inheritance taxes have been settled.* . . . In all events, title to such remaining assets . . . shall vest as of the time of the Trustor's death. . . ."

*Id.* at 127(emphasis added).

The distribution of the assets was set forth in Article III of the Trust as follows: "Upon the death of [Reichert], this trust

---

**4.** We note that IC 30–4–3–6 was amended in 2005. While the amendment caused the *numbering in the list of trustee duties to change,* the statutory language pertinent to this decision was not changed. Therefore, for ease of reference, we cite to IC 30–4–3–6 as it currently exists.

shall terminate and the Trustee shall distribute the assets of the trust as follows": (1) $25,000.00 to a local church; (2) $1,000.00 to each of two charities; (3) the home on English Way in Evansville to the Trustee; and (4) the remaining Trust assets in equal shares to Randall and the Trustee. *Id.* at 127–28.

By agreeing to act as Trustee, Brian owed fiduciary duties to his brother Randall, as beneficiary of the Trust. Around that same time Brian also assumed a fiduciary relationship with his mother by serving as her power of attorney and her health care representative. *Tr.* at 122. When Reichert moved into Brian's home, he acted as her landlord and caretaker. Serving in these separate fiduciary capacities, Brian should have known to be scrupulous in his actions to avoid breaching his fiduciary duties.

As Randall has argued, we find that Brian committed a significant breach of trust in at least three different ways: (1) by failing to keep the trust property separate from or clearly identifiable from property subject to another trust (IC 30–4–3–6(b)(5)); (2) by engaging in self-dealing (IC 30–4–3–7); and (3) by failing to maintain clear and accurate accounts (IC 30–4–3–6(b)(6)). "While not every violation of duty, act of imprudence or neglect, mistake or mismanagement, or error in judgment requires removal, a court may generally remove a trustee if such person's continuing to act as trustee would be detrimental to the beneficiary's interests." 28 I.L.E., *Trusts* § 87.

### A. Commingling

■ Citing to IC 30–4–3–6(b)(5), Randall asserts that Brian breached his duty of trust by failing to keep the property of the Trust separate from the property of a separate trust established by Reichert's mother and administered by Integra Bank (the "Integra Trust"). This breach is revealed by the list of fifteen checks written from the Trust's Operating Account, over a period of almost three years, for expenses that should have been paid out of the Integra Trust. *Pl.'s Ex.* 2. This breach is also evident by Integra Bank's Petition for a Return of Funds, filed on June 11, 2004, which requested the trial court to order Brian to file a formal accounting to show his management of Integra Trust funds within Reichert's Trust. *Pl.'s Ex.* 1.

During the hearing, Randall's attorney engaged in the following exchange with Brian:

Q Did you know that there was a State statute that prohibits the commingling of assets from one trust to another?

A I didn't at the time.

Q You do now?

A I do now.

Q Why would you pay the expenses from the Integra trust? Why would you pay that, uh, out of the trust that we're here in court for?

A Well hindsight being twenty/twenty, uh, I probably should've let Integra pay those. The harm I ... I don't see the harm that's been done in the sense that both my brother and I are the same beneficiaries of both trusts, though.

Q You don't understand that you have to keep ... as a bank ... former bank president, you have to keep the assets straight in one trust, income and expenditures, and the assets straight in the other, uh, account?

A I ... I can see know [sic] in retrospect that, uh, from a record keeping standpoint, it ... it should've been done differently.

Q And as a matter of fact, your brother, uh, alerted you to this back in June of '04, did he not?

....

Q So you knew back in June of '04, that your brother was complaining and objecting to you taking funds from Integra Bank and stickin' 'em in the trust over at United Fidelity.

A I was aware.

Q But you did it anyway. If you knew it was gonna be an issue why did you keep doin' it?

A I did not see the materiality of the harm that my ... keeping funds in either account that ... my brother and I were sole beneficiaries. I did not see the harm.

*Tr.* at 125–27.

On appeal, Brian admits that, while "he did pay the expenses of one trust with assets of the other trust" he "did so because Brian and Randall are both the only and equal beneficiaries under both trusts." *Appellee's Br.* at 13. IC 30–4–3–6(b)(5), however, contains no such exception.

While not raised by the parties, from our review of the record before us, it appears that Brian also improperly deposited funds into the Trust that he obtained from a testamentary trust created under the Last Will and Testament of Manson L. Reichert ("Manson Trust")—a trust over which Fifth Third Bank served as trustee. On December 14, 2000, Fuchs sent a letter, on Brian's behalf, asking Fifth Third Bank to pay expenses incurred by Reichert, as beneficiary of the Manson Trust. *Pl.'s Ex. 4.* The expenses made on Reichert's behalf were itemized as payment for caregivers, for utilities, and for Reichert's food, clothing, and personal supplies, which together totaled approximately $2,300 a month. *Id.* Brian also requested $7,160.00 for repairs on the English Way home, and $25,500.00 for repairs on the Gum Street home. *Id.* The total amount requested from the Manson Trust on December 14, 2000 was $32,660.00. On December 29, 2000, Brian made a deposit of that exact amount into the Operating Account without designating the source of the funds. *Pl.'s Ex. 8* at 5. While this deposit alone may not be troubling, without a detailed accounting of how those funds were used, it is unclear whether this money was used for the designated purposes.

Brian breached his duty of trust by failing on numerous occasions to keep the property of the Trust separate from the property of the Integra Trust and the Manson Trust.

### B. Self–Dealing

■ Brian borrowed the following sums from the Trust: $36,000 on April 30, 1997; $3,000.00 on September 29, 1997; and $25,000.00 on November 29, 1999. As noted above, in general, a trustee may not exercise a power that conflicts with the trustee's individual interests. IC 30–4–3–5. A trustee also has a duty not to loan funds to himself or an affiliate. IC 30–4–3–7(a)(1). The trial court recognized this duty, but concluded that Brian's loans to himself in the amounts of $36,000.00, $3,000.00, and $25,000.00 were proper due to the fact there was prior authorization by Reichert, who was the sole beneficiary of the Trust. *Appellant's App. Vol. 1 tab B* at 15. We recognize that IC 30–4–3–5 was amended in 2006, however, at the time these loans were made, even Reichert's prior approval would not have allowed Brian to engage in this conflict of interest. The trial court erred in making this finding.

Further, the record before us contains little evidence that Brian intended the $36,000.00 as a loan. By Brian's own accounting, the $36,000.00 was withdrawn in cash from the Savings Account on April 30, 1997 without notation that the money was a loan. He deposited $30,000.00 into the Operating Account the next day, again with no notation of repayment of a loan.

Brian repaid the remaining $6,000.00 on June 29, 2006—without interest and more than nine years after he withdrew the money. Additionally, Brian repaid this money only after Randall had persistently requested an accounting of the Trust for the years 1996 through 1999. By making this loan, Brian breached his duty as the Trustee.

Regarding the $3,000.00 loan, when asked during the hearing whether he knew that "a trustee's not supposed to borrow money from the trust," the Trustee responded, "that is in the code, but at the same time the trust document that, uh, was, we felt governing here, allowed for that." *Tr.* at 181–82. This argument is undermined by the Trustee's own brief, where he states: " 'Loans' are not expressly addressed in the [T]rust." *Appellee's Br.* at 17. In the alternative, the Trustee argues that he borrowed this $3,000.00 with Reichert's prior approval. Again, prior approval does not remedy the Trustee's breach. The Trustee again breached his duty to the Trust when engaging in this transaction.

Finally, the Trustee borrowed $25,000.00 from the Savings Account on November 29, 1999, by means of a check signed by Reichert. Randall again contends that borrowing money from the trust was a breach of the Trustee's duty of trust. The Trustee counters that, since Reichert could revoke her Trust at any time, she likewise held the power to invest or loan the funds in any way she saw fit. *Id.* While all parties agree that the Trust could be revoked at any time, the fact remains that

Reichert did not revoke the Trust. Brian's self-dealing in borrowing $25,000.00 from the Trust, even money that was repaid with interest, was again a breach of the Trust.

### C. Clear and Accurate Accounts

■ Lastly, Randall contends that Brian should be removed as Trustee because he failed to keep clear and accurate accounts, and to provide Randall with a timely accounting. Randall requested his first accounting shortly after Reichert's death. Pursuant to IC 30–4–3–6(b), Brian had the duty to maintain clear and accurate accounts with respect to the trust estate, and upon reasonable request, to give the beneficiary complete and accurate information concerning any matter related to the administration of the trust. Brian also had the duty to deliver a written statement of accounts to each beneficiary annually. IC 30–4–5–12(a). Randall received no written statement about the account until Brian filed the first intermediate accounting and report on November 17, 2004—more than three years after his mother's death.[5] Had this information been available sooner, Randall could have more readily reviewed the transactions of the Trust.

At its inception, the Trust was funded with only the English Way and Gum Street properties. The following day, however, a deposit of $63,155.24 was made to the Operating Account and a deposit of $161.61 was made to the Savings Account. The Trustee's accounting does not state why these accounts were opened, how they

---

5. By the terms of the Trust, "distribution of the assets of this Trust shall not be delayed for more than two (2) years after the death of the Trustor, or at such later time as the federal estate taxes and state inheritance taxes have been settled...." *Appellant's App. Vol. 3* at 126–27. By the Trustee's own account, he paid federal estate taxes and Vanderburgh County inheritance taxes on September 11, 2002 (Operating Account checks 1290 and 1291) and Indiana estate taxes on March 26, 2003 (Operating Account check 1332). While Randall did not get his first accounting until 2004, it is unclear, under the terms of the Trust, why any assets still remained in the Trust.

became a part of the Trust, or from where the money for each deposit came.

In its Amended Findings of Fact and Conclusions of Law, the trial court found:

The Trust held two separate deposit accounts at United Fidelity Bank ... in the name of the Trust to maximize interest on bank deposits.... [The *Savings Account*] had limited check writing privileges and *paid a higher rate of interest.* [The *Operating Account] was established to pay ongoing expenses of the Trust.*

*Appellant's App. Vol. 1 tab B* at 10 (finding 35) (emphasis added). The record before us does not support this finding. In fact, the bank statements found in Plaintiff's Exhibit 8 reveal that the Savings Account paid a lower rate of interest than the Operating Account. The Trustee submitted forty-nine Savings Account statements, twenty-four of which show that no interest was earned during the reporting month. The remaining twenty-five statements each reveal a monthly interest earning of less than $11.00. These forty-nine statements reveal that, over a four-year period, the total interest earned on the Savings Account was $179.17. The trial court found that the Operating Account earned interest totaling $17,934.50. *Appellant's App. Vol. 1 tab B* at 11. The trial court erred in concluding that the Savings Account was necessary to maximize earned interest.

The trial court also found that the Operating Account "was established to pay ongoing expenses of the Trust." *Appellant's App. Vol.* 1 tab B at 10. The record, likewise, does not support this. Of the first five checks written on the Trust's Operating Account, four were written to the Trustee's children as gifts. In other words, of the first $41,490.00 spent out of the Operating Account, $40,000.00 was spent for purposes other than ongoing expenses.

It is troubling to note that the existence of the two accounts, instead of making the administration of the Trust easier and more transparent, complicated and confused the accounting. On April 22, 1997, the Trustee withdrew $25,000.00 and then $6,000.00 from the Operating Account and deposited those two amounts into the Savings Account. On April 29 and again on April 30, 1997, the Trustee withdrew $5,000.00 from the Operating Account and deposited those sums into the Savings Account. There is no explanation for why these amounts were transferred or for what use they were intended. On April 30, 1997, the Trustee withdrew $36,000.00 in cash from the Savings Account, again with no explanation of the reason. The following day $30,000.00 was deposited back into the Operating Account—the source of the money transferred the previous week. The $6,000.00 was not accounted for until the Trustee repaid it on June 29, 2006, five years after Reichert's death and four years after Randall had requested an accounting.

The transfer of money between the two accounts also made it more difficult to determine that the Trustee had borrowed $25,000.00 on November 29, 1999. In March and May 1999, unexplained deposits were made into the Operating Account in the amounts of $50,000.00 and $43,873.46, respectively. On November 29, 1999, $25,000.00 was transferred from the Operating Account into the Savings Account. That same day, a loan of $25,000.00 was made to the Trustee from the Savings Account. The lack of accounting even impacted the Trustee's ability to know that he had failed to repay the $25,000.00 loan. At the hearing, the Trustee testified that he only "learned" of the unpaid $25,000.00 in the summer of 2006. *Tr.* at 124. A

Trustee is responsible for keeping a proper accounting so that these issues can be revealed. Had Brian prepared the accounting in a timely fashion, Randall could have discovered in 2002 that the loan had not been repaid.

As our court has stated:

"Accountability is the hallmark of a trust. Property cannot be the subject of a trust where its application for the purposes of the trust depends upon the uncontrolled discretion of the one to whom legal title has been entrusted. Unbridled discretionary powers are inconsistent with the existence of a trust relationship."

*Marshall & Ilsley Trust Co., N.A. v. Woodward*, 848 N.E.2d 1175, 1182 (Ind.Ct. App.2006) (quoting *Cox v. Cox*, 357 N.W.2d 304, 306 (Iowa 1984) (internal citations omitted)). Additionally, " '[o]ne of the most fundamental duties of the trustee is that he must display throughout the administration of the trust complete loyalty to the interests of the beneficiary, and must exclude all selfish interest....' " *Massey v. St. Joseph Bank and Trust Co.*, 411 N.E.2d 751, 753 (Ind.Ct.App.1980) (quoting George Gleason Bogert & George Taylor Bogert, *The Law of Trusts & Trustees* § 543, at 217 (2d ed.1978)). " 'Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the marketplace.' " Bogert, *supra* at 217–218 (quoting Cardoza, C.J., *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, 546–47 (1929)).

We have addressed only some of the inconsistencies we find in the Trustee's accounting. Our review of the record before us confirms that Randall's confidence in Brian's ability to continue to act as Trustee is rightfully shaken. Here, the Trustee committed repeated instances of self-dealing and breach of fiduciary duty including failing to account, making loans to himself, and commingling of funds between separate trusts. These would be troubling acts if committed by a layperson acting as trustee; they are shocking in an experienced bank officer acting as trustee. We find the trial court abused its discretion in failing to remove Brian as Trustee. We remand this issue with instructions for Brian to be removed as Trustee and a new trustee appointed pursuant to the terms of the Trust.

## II. Loan Interest

Randall next contends that the trial court erred in allowing Brian to repay his loans from the Trust at an interest rate of 4.5%, which was 3.5% lower than both the market rate during the applicable period and the rate set by statute in IC 24–4.6–1–102.

Brian borrowed money from the Trust on numerous occasions. On April 30, 1997, he withdrew $36,000.00 from the Savings Account—$30,000.00 of which Brian repaid to the Operating Account on May 1, 1997 and the remaining $6,000.00 he repaid to the Operating Account nine years later, on June 29, 2006. *Pl.'s Ex. 8* at 9. Brian did not pay interest on either of these loans. On September 30, 1997, Brian wrote a check against the Operating Account and borrowed $3,000.00 from the Trust. *Id.* at 11. Brian repaid this amount on October 21, 1997 with an interest payment of $6.98 (there is no designation of the rate of interest). Finally, on November 29, 1999, Brian cashed a check from the Savings Account in the amount of $25,000.00. *Id.* at 10. Reichert signed this check and, although there was no notation on the check, the accounting designated the amount as a loan. *Id.* Brian repaid the $25,000.00, together with interest on the loan calculated at a rate of 4.5% (i.e., $8,022.00), on January 16, 2007; more than

seven years after he borrowed the money, six years after his mother died, and six months after he filed his fourth accounting.

Following a hearing in February 2007, the trial court found, "Trustee has failed to pay to the Trust interest on certain of these loans. The Court finds that a reasonable rate of interest during this period of time is 4.5%." *Appellant's App. Vol. 1 tab B* at 15. The trial court ordered Brian to pay 4.5% interest on: (1) $30,000 for the period from April 30, 1997 through May 1, 1997; (2) $6,000 for the period April 30, 1997 through June 29, 2006; and (3) $3,000 for the period from September 30, 1997 through October 21, 1997. *Id.* The trial court required no additional payment of interest on the $25,000.00 loan as Brian had already paid interest at a rate of 4.5%

IC 24–4.6–1–102 provides: "When the parties do not agree on the rate, interest on loans or forebearances of money, goods or things in action shall be at the rate of eight percent (8%) per annum until payment of judgment." Here, Brian does not deny that the $25,000.00 was a loan from the Trust. He does not contest that the money should be repaid with interest. He does, however, contend that, as Trustee, he had the discretion to determine the rate of interest. He also contends that, by reversing the trial court's acceptance of the 4.5% interest rate, we would be judging the credibility of the witnesses and reweighing the evidence. We disagree.

First, Brian uses flawed reasoning to conclude that he has discretion. Brian asserts his discretion arises because: "If [he] had the authority to gift himself the principal amount of the loans, then certainly he had the right to obligate himself to repay the money"; and "[He] exercised his discretion in borrowing the money and committing to repay the loans." *Appellant's Br.* at 18. If the Trustee borrowed the money *from his mother,* as he contends, *she* is the one who required him to repay the money. Contrary to the Trustee's contention, most lenders will not loan money to a borrower who refuses to pay. As Trustee, Brian had no discretion to avoid his obligation to repay a *loan* from the Trust. During Reichert's lifetime, the power to loan the money and to require repayment belonged solely to her.

Second, our determination that the trial court erred in allowing an interest rate of 4.5% does not require us to judge witness credibility or reweigh the evidence. We find no evidence in the record before us, save the Trustee's assertion of discretion, to support the trial court's conclusion that 4.5% was the appropriate interest rate. The only testimony addressing the interest rate was given by Steven Brackmann; a CPA and witness for Randall. Brackmann testified, "I used eight percent because it's a statutory rate in Indiana to my understanding. And also, at the time period that most of these disbursements occurred ... the prime interest rate was at eight percent or higher." *Tr.* at 289. During cross-examination, Brian's counsel's addressed the question of interest rate by asking one question—"Did you ... read the statute from which you, um, gathered, uh, the eight percent, uh, rate of return?" *Tr.* at 320. Brackmann simply responded, "No, I did not read the statute." *Id.* The testimony of the sole expert witness supported the imposition of an 8% interest rate. Without other evidence of a different interest rate, the fact that Brackmann had not read the pertinent statute was irrelevant. Finding the trial court's determination that Brian should pay 4.5% clearly erroneous, we reverse and remand this issue for a determination of the amount of interest Brian must pay on these loans when calculated at an 8% interest rate.

### III. Beneficiary's Attorney Fees

Finally, Randall contends that the trial court erred in its award of attorney

fees. Specifically, he argues that the trial court improperly reduced the attorney fee award from his request of $29,628.69 to $4,000.00.

As previously noted, a beneficiary of a trust may maintain an action to compel the trustee to redress a breach of trust or to remove a trustee for cause. IC 30–4–3–21(a). A trustee who commits a breach of trust is liable to the beneficiary for reasonable attorney fees incurred by the beneficiary in bringing an action on the breach. IC 30–4–3–11(b)(4). The trial court found that Brian, "in his capacity as trustee of the Trust, failed to keep accurate records regarding the source of the funds deposited into the Operating Account and Savings Account of the Trust. Further, [Brian] has failed to produce either a carbon copy or photocopy of 66 of the 570 checks written on these two deposit accounts." *Appellant's App. Vol. 1 tab B* at 16. The trial court also found that Brian failed to pay interest on loans that he made to himself from the Trust. *Id.* at 15. Each of these actions constituted a breach of trust.

While finding that an award of attorney fees was warranted, the trial court nevertheless reduced Randall's award from his request of $29,628.69 to $4,000.00. The award or denial of attorney fees is within the sound discretion of the trial court, and in the absence of error or an abuse of that discretion, we must affirm the trial court's decision. *Malachowski v. Bank One,* 682 N.E.2d 530, 533 (Ind.1997); *Estate of Daniels ex rel. Mercer v. Bryan,* 856 N.E.2d 763, 766 (Ind.Ct.App.2006). While the amount of an attorney fee award is likewise within the sound discretion of the trial court, that amount must nonetheless be reasonable and supported by the evidence. *Hanson v. Valma M. Hanson Revocable Trust,* 855 N.E.2d 655, 668 (Ind.Ct.App.2006) (citing *Franklin College v. Turner,* 844 N.E.2d 99, 105 (Ind.Ct.App.2006)).

Our court has repeatedly noted, that in determining the reasonableness of an attorney fee award, the trial court should consider:

" 'not merely the result, but whether the trustees are acting reasonably and in good faith, whether the issue on which they are divided is of little or momentous consequence to the estate or its beneficiaries, whether the facts are undisputed or are so controversial as to require an adversary proceeding for their determination, whether the legal questions are simple or complex, settled by precedents or open to serious debate, and any other matters that bear upon the reasonableness or the necessity for the litigation and the multiple employment of attorneys therein.' "

*Hanson,* 855 N.E.2d at 667 (quoting *Malachowski,* 682 N.E.2d at 533 (quoting *Zaring v. Zaring,* 219 Ind. 514, 523, 39 N.E.2d 734, 737 (1942))).

In *Franklin College,* the college brought an action against a student for unpaid loans and requested $4,375.00 in collection costs and attorney fees. 844 N.E.2d at 100. An affidavit of the college's "controller," which was attached as an exhibit to the college's summary judgment motion, was the sole support for the amount requested. *Id.* at 105. In addressing the award, the trial court noted that the college's actual payment to its attorney was irrelevant; instead, the real issue was what is "a reasonable fee." *Id.* The trial court considered factors such as the attorney's hourly rate, the result achieved in the litigation, and the difficulty of the issues involved, and reduced the college's requested award to $420.00. *Id.* On appeal, our court approved both the method of calculating a reasonable attorney fee and the reduced amount of the attorney fee award. *Id.*

In *Hanson*, beneficiaries of a trust sued the trustee for breach of duty. On remand from its original appeal, the trial court granted the trustee partial summary judgment but ordered the trustee to pay the beneficiaries $25,000.00 of their requested $55,368.00 in attorney fees. *Hanson*, 855 N.E.2d at 667. The beneficiaries again appealed and argued that the trial court erred in reducing the amount of attorney fees to which they were entitled. *Id.* Our court agreed and remanded the case with orders for the trial court to use the factors set forth in *Franklin College*—reasonableness of hourly rate, number of hours appropriately spent, complexity of litigation. *Id.* at 670–71.

Here, Randall submitted a twenty-one page, itemized accounting regarding the time his attorneys spent obtaining and verifying records concerning the Trust. *Pl.'s Ex.* 31. The first entry is dated March 28, 2001, and the final entry is dated January 30, 2007. Each entry of the accounting sets forth the specific action taken, the date it was performed, by whom, the amount of time spent, the hourly rate charged, and the total charge. The trial court's complete rationale for its reduction of the award was as follows:

> due to the lack of detail describing the legal services rendered, it is clear to the Court that the majority of the legal services which were incurred were for matters other than the deficiencies in the Trustee's reporting and are not proper for charge under the statute to the Trust.

*Appellant's App. Vol. 1 tab B at 16.*

We find this explanation insufficient to justify the trial court's significant reduction of the attorney fee request. *See Hanson*, 855 N.E.2d at 668. The trial court made no attempt to analyze the reasonableness of the attorney fees in light of each attorney's hourly rate, the result achieved in the litigation, and the difficulty of the issues involved. Further, the trial court failed to note that the Trustee's counsel agreed that the hourly rate charge by Randall's attorneys was reasonable. *Tr.* at 119 ("we're not questioning the, uh, rate they charged ... we're only questioning, uh, the amount that had to be incurred"). In light of our court's reasoning in *Hanson* and *Franklin College*, we reverse the trial court's attorney fee award in the amount of $4,000.00 and remand this issue to the trial court to determine what attorney fees were reasonably incurred by Randall in securing from the Trust a proper and timely accounting, in uncovering the need for the Trustee to repay loans made to him from Trust funds, and in ensuring that the Trust received the appropriate interest on money loaned from the Trust. We order the Trust to pay Randall such reasonable attorney fees as the court shall determine, and order the Trustee to reimburse the Trust for such sums.

Reversed and remanded.

RILEY, J., and MAY, J., concur.