In re Matter of the STUART COCHRAN IRREVOCABLE TRUST,

Chanell and Micaela Cochran, Appellants–Petitioners,

v.

KeyBank, N.A., Appellee–Respondent.

No. 71A04–0806–CV–384.

Court of Appeals of Indiana.

March 2, 2009.

1130

Dale W. Eikenberry, Daniel D. Tracht-man, Wooden & McLaughlin LLP, India-napolis, IN, Shawn P. Ryan, South Bend, IN, Attorneys for Appellants.

Jeffery A. Johnson, Patricia E. Prim-mer, Robert J. Palmer, May Oberfell Lor-ber, Mishawaka, IN, Attorneys for Appel-lee.

## OPINION

BAKER, Chief Judge.

Appellants-petitioners Chanell and Mi-caela Cochran (the Beneficiaries) appeal

the trial court's order entering final judgment in favor of appellee-respondent KeyBank, N.A. (KeyBank), on the Beneficiaries' petition seeking an accounting and alleging that KeyBank had breached its obligations as Trustee. The Beneficiaries argue that the trial court erroneously concluded that KeyBank did not violate the prudent investor rule and or breach its duties as trustee. Finding no error, we affirm.

## FACTS

On December 28, 1987, Stuart Cochran created an irrevocable trust (the Trust) and named his two daughters, Chanell and Micaela, as the Beneficiaries. At that time, the Beneficiaries were two and four years old, respectively. In 1989, Stuart's wife, now Mary Kay Vance, filed for divorce and was awarded full custody of the children.

Stuart funded the Trust with life insurance policies and was assisted by an insurance advisor, Art Roberson. Elkhart National Bank was the initial trustee; subsequently, Pinnacle Bank (Pinnacle) was named as a successor trustee. Pinnacle served as the trustee until 1999. In January 1999, Pinnacle called Vance and informed her that it no longer wished to serve as trustee because of Stuart's insistence on having third parties—specifically, himself, his sister, and Roberson—involved in the trustee's decisionmaking process. Pursuant to the terms of the Trust, Vance was required to appoint a successor trustee. Vance retained an attorney, and in January 1999, they met with a KeyBank representative to discuss moving the Trust to KeyBank. On February 3, 1999, Vance appointed KeyBank as successor trustee.

### The 1999 Exchange and the VUL Policies

At approximately the same time she received notice that Pinnacle intended to resign as trustee, Vance received a call from Roberson, who provided new recommendations regarding the insurance policies held by the Trust. Specifically, Roberson recommended that the three life insurance policies and one annuity then held by the Trust be replaced with two new life insurance policies—a ManuLife Variable Universal Life policy and an American General Variable Universal Life policy (collectively, the VUL policies).[1]

At the time KeyBank assumed the duties of successor trustee, the Trust's assets consisted of three life insurance policies and one annuity and with a collective net death benefit of $4,753,539.00. As noted above, however, Roberson had recommended an exchange of policies, replacing these policies with the two VUL policies. When KeyBank assumed its duties, the underwriting for the exchange of policies had been approved and Stuart had already submitted to the physical exams. In February and March 1999, KeyBank approved the transaction and the exchange of policies took place (the 1999 Exchange), with a new total death benefit of $8 million.

Following September 11, 2001, the stock markets took a dramatic decline. The downward trend in the markets had an adverse effect on the value of the mutual fund investments contained in the VUL policies. In fact, in 2001, the policies lost money, meaning that the cost of insurance and the carriers' administrative charges

---

1. The trial court observed that, in general, "VUL policies do not feature a guaranteed death benefit or a stipulated guaranteed premium sufficient to sustain the policy for the life of the insured, as do whole life and various other kinds of insurance policies.... According to insurance experts, unlike a whole life policy, a VUL policy requires a more active management and monitoring." Appellant's App. p. 15–16.

were greater than the income generated by the investments; in 2002, the losses were even greater.

### The Oswald Review

In the spring of 2003, KeyBank retained Oswald & Company (Oswald), an independent outside insurance consultant, to audit the VUL policies. At that time, Stuart was fifty-two years old and the VUL policies had a combined death benefit of $8,007,709.

Oswald first considered the American General VUL policy, finding, in pertinent part, as follows:

> We feel the financial strength ratings for the carrier are excellent. . . .
>
> . . . Based on a hypothetical gross interest rate of 8% and current cost of insurance, the policy is shown to remain in force through Stuart's age 71. Based on a hypothetical gross interest rate of 0% and the guaranteed cost of insurance the policy is shown to remain in force to Stuart's age 58.
>
> The net investment loss for [the] period of 1/1/2001 to 3/31/2001 was $12,189.39. . . .
>
> * * *
>
> RECOMMENDATION
>
> This policy is rated as a Category Three (3) policy (on a scale from one to five, with one being the best). This is due to the fund performance of the policy and the fact that additional future premiums may be required. The policy should be audited every two to three years or more often if the underlying fund performance remains lower than projected, the carrier's financial strength ratings decline or there are policy loans or withdrawals taken.

Appellants' App. p. 312–13. Oswald reached similar conclusions regarding the ManuLife VUL policy:

> We feel the financial strength ratings for the carrier are very good to excellent. . . .
>
> . . . Based on a hypothetical gross interest rate of 8% with current cost of insurance, the policy is shown to remain in force through policy year 22 [Stuart's age 70]. Based on the guaranteed cost of insurance and a hypothetical gross interest rate of 0%, the policy is shown to remain in force through policy year 12 [Stuart's age 60].
>
> * * *
>
> The net investment loss for the policy year ending on January 4, 2003 was $36,672.43. . . .
>
> RECOMMENDATION
>
> This policy is rated as a Category Three (3) policy (on a scale from one to five, with one being the best). The policy should be audited every two to three years or more often if the underlying fund performance is lower than projected, the carrier's financial strength ratings decline or if there are further policy withdrawals.

*Id.* at 315.

Therefore, in the trial court's words, "[t]he Oswald review indicated that it was likely that the two existing policies would lapse before [Stuart] reached his life expectancy of 88 years." Appellants' App. p. 16. Moreover, because Stuart's "financial fortune had also taken a negative turn by this point in time, he had no financial wherewithal to supplement the trust with additional resources or through the purchase of additional policies of life insurance." *Id.* at 17.

As Oswald conducted its review of the VUL policies, Roberson completed his own review of alternative policies. Roberson eventually proposed to KeyBank that a John Hancock policy be purchased to re-

place the two VUL policies. The John Hancock policy offered a lump sum death benefit of $2,787,624 that was guaranteed to age 100.

KeyBank requested Oswald to review the John Hancock policy. Representatives of those companies exchanged some emails, in which an Oswald employee noted that the John Hancock policy "drastically reduces" the expected death benefit, asking, "[i]s this ... what [your] client wants to do?" *Id.* at 318. The KeyBank representative replied in the affirmative, stating that "[i]t is [Stuart's] intention to reduce his life insurance coverage to the amount seen on the John Hancock illustrations." *Id.* at 317. After Oswald reviewed the John Hancock policy and compared it to the two VUL policies, it concluded as follows:

> We feel the financial strength ratings for John Hancock are very good.... The proposed John Hancock illustration shows no further premiums and projects coverage at current mortality and interest rates, to remain inforce [sic] to Stuart's age 100. At guaranteed mortality and interest rates the policy is projected to remain inforce [sic] to age 100.

*Pros of exchanging to John Hancock Policy:*

- Since proposed John Hancock is a non-[VUL] policy, there will [be] less fluctuation in the cash values.
- The proposed John Hancock policy offers guaranteed coverage to age 100 of $2,787,624.
- No ongoing premiums are required to maintain the proposed coverage of $2,787,624.

*Cons of exchanging to John Hancock Policy:*

- There will be a new contestability period and suicide period in the new policy.

- There will be new expense charges, including commissions ...
- There will be surrender charges incurred of ... $107,764.

## RECOMMENDATION

If the client feels comfortable with the points referenced in this report and feels comfortable with the proposed John Hancock policy and the concomitant results associated with this transaction, then purchase is recommended.

Our recommendation is contingent upon underwriting. Should his underwriting come back other than Super Preferred Nontobacco, as illustrated, then we will need to review the resultant changes.

If purchased, the John Hancock policy will be rated as a Category One (1) policy (on a scale from one to five, with one being the best). No further audits are necessary unless this carrier's ratings decline.

*Id.* at 334–35. In an email, an Oswald employee summarized its conclusion:

> We're sure the guarantees in this John Hancock product have a lot of appeal to [Stuart] given the fact of his substantial investment losses in his current [VUL] policies.

> Given the facts that he is moving to a fixed product with the death benefit guaranteed to age 100 and $0 future outlay, our recommendation would be to move forward with the proposed John Hancock coverage if the client is comfortable with the reduction in death benefit.

*Id.* at 317.

After reviewing Oswald's analyses of the respective policies and considering the recommendations contained in the reports,

in June 2003, KeyBank decided to retire the VUL policies and purchase the John Hancock policy in their stead (the 2003 Exchange). After Stuart underwent a medical exam, John Hancock underwriters rated him as a preferred risk rather than a super preferred. That classification resulted in the guaranteed benefit being $2,536,000 rather than $2,787,624. The Oswald employee who had performed the analysis testified that this change would not have altered Oswald's ultimate recommendation. In January 2004, Stuart died unexpectedly at the age of 53. The Trust received $2,536,000 in life insurance proceeds for the Beneficiaries' benefit.

On April 2, 2004, the Beneficiaries filed a petition to docket the Trust and to require KeyBank to account. On March 7, 2005, KeyBank filed a petition to reform the trust and for approval of its accounting. The Beneficiaries filed a counterclaim and claim for surcharge, arguing, among other things, that KeyBank had breached its fiduciary duties as Trustee. A bench trial was held on August 28–30, 2007, on the issues raised in the Beneficiaries' counterclaim and claim for surcharge, with all other issues being reserved for a later time. On May 29, 2008, the trial court entered findings of fact and conclusions of law, ruling in KeyBank's favor. Among other things, the trial court concluded as follows:

### CONCLUSIONS OF LAW AND ANALYSIS

\* \* \*

(20) The ultimate question facing this Court . . . is whether the actions of the Trustee, KeyBank, were consistent with the Settlor's intent as expressed in the Trust document and met its fiduciary duties to the Beneficiaries. In essence, based on the circumstances facing the Trust in 2003, was it prudent for the Trustee to move the trust assets from insurance policies with significant risk and likelihood of ultimate lapse into an insurance policy with a smaller but guaranteed death benefit? This Court concludes that this conduct was consistent with the standard established by the prudent investor rule.

(21) KeyBank and its representative acted in good faith to protect the corpus of the Trust based on the downturn in the stock markets and the prospect that the existing policies would lapse before the expected life expectancy of the Settlor.

(22) In hindsight, due to the unexpected demise of the Settlor at age 53, KeyBank's decision resulted in a significant reduction in the death benefit paid to the beneficiaries. However, from the perspective of the Trustee at the time of its decision, it was prudent to protect the Trust from the vagaries of the stock market and from predicted lapse of the existing policies. It might also have been prudent to take a "wait and see" approach, however, the prudent investor standard gives broad latitude to the Trustee in making these types of decisions.

(23) Had the insurance policies lapsed, the Beneficiaries would have received no distribution from the Trust. Certainly, that outcome was not within the intent of the Settlor at the time he established this Trust.

(24) Frankly, financial trends outside of the control of the Trustee or the Beneficiaries were the direct and proximate cause of the problem facing the Trust in 2003. While it

would have been preferable for the Trustee to provide regular accountings to the Beneficiaries, the receipt of timely financial reports by the Beneficiaries would not have changed the negative financial condition of the Trust.

(25) The Beneficiaries want this Court to focus on the defects in Key-Bank's decisionmaking process, and while the Court recognizes that this process was certainly less than perfect with respect to the Cochran Trust, the Court concludes that it would need to engage in sweeping conjecture, which is not supported by the evidence, to find that damages resulted to the Beneficiaries based on the circumstances presented here.

(26) Accordingly, this Court concludes that KeyBank did not breach its fiduciary responsibility to the Trust or the Beneficiaries, and the lack of financial reporting to the Beneficiaries and the decision to the [sic] reinvest the corpus of the Trust in a guaranteed insurance policy was not the proximate cause of damages to the Beneficiaries.

(27) In conclusion, by insuring [sic] that the Trust was funded by a guaranteed death benefit in the sum of $2,536,000.00, KeyBank acted in good faith to protect the interests of the Beneficiaries and to comply with the directives of the Settlor as contained in the Trust document.

*Id.* at 22–24. The Beneficiaries now appeal.

## DISCUSSION AND DECISION

### I. *Standard of Review*

The trial court entered findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A). We may not set aside the findings or judgment unless they are clearly erroneous. *Menard, Inc. v. Dage-MTI, Inc.,* 726 N.E.2d 1206, 1210 (Ind. 2000). First, we consider whether the evidence supports the factual findings. *Id.* Second, we consider whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen,* 671 N.E.2d 98, 102 (Ind.1996). A judgment is clearly erroneous if it relies on an incorrect legal standard. *Menard,* 726 N.E.2d at 1210.

In conducting our review, we give due regard to the trial court's ability to assess the credibility of witnesses. *Id.* While we defer substantially to findings of fact, we do not do so to conclusions of law. *Id.* We do not reweigh the evidence; rather, we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Yoon v. Yoon,* 711 N.E.2d 1265, 1268 (Ind. 1999).

### II. *The Prudent Investor Act*

The Beneficiaries first argue that the trial court erroneously concluded that Key-Bank's actions leading up to the 2003 Exchange did not violate the Indiana Uniform Prudent Investor Act (PIA). Ind.Code § 30–4–3.5–1 et seq. In relevant part, the prudent investor rule, as set forth in the PIA, provides as follows:

(a) A trustee shall invest and manage trust assets as a prudent investor would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust. In satisfying this standard, the trustee shall exercise reasonable care, skill, and caution.

(b) A trustee's investment and management decisions respecting individual assets must be evaluated not in iso-

lation but in the context of the trust portfolio as a whole and as a part of an overall investment strategy having risk and return objectives reasonably suited to the trust.

(c) Among circumstances that a trustee shall consider in investing and managing trust assets are those of the following that are relevant to the trust or its beneficiaries:

(1) General economic conditions.

(2) The possible effect of inflation or deflation.

* * *

(5) The expected total return from income and the appreciation of capital.

(6) Other resources of the beneficiaries.

(7) Needs for liquidity, regularity of income, and preservation or appreciation of capital.

* * *

(d) A trustee shall make a reasonable effort to verify facts relevant to the investment and management of trust assets.

* * *

(f) A trustee who has special skills or expertise, or is named trustee in reliance upon the trustee's representation that the trustee has special skills or expertise, has a duty to use the special skills or expertise.

I.C. § 30–4–3.5–2.[2]

### A. Delegation

■ The Beneficiaries first argue that KeyBank violated the PIA by imprudently and improperly delegating certain decisionmaking functions to Roberson and Stuart. Initially, we observe that the PIA contemplates the delegation of functions by a trustee under certain circumstances:

A trustee may delegate investment and management functions that a prudent trustee of comparable skills could properly delegate under the circumstances. The trustee shall exercise reasonable care, skill, and caution in:

(1) selecting an agent;

(2) establishing the scope and terms of the delegation, consistent with the purposes and terms of the trust; and

(3) reviewing the agent's actions periodically in order to monitor the agent's performance and compliance with the terms of the delegation.

I.C. § 30–4–3.5–9(a).

Here, it is evident that Roberson chose to monitor the Trust throughout its existence. He helped to create it and, in 1999, recommended an exchange of policies. Then, in 2003, KeyBank began its own review of the viability of the current structure of the Trust, engaging Oswald to analyze the current VUL policies. Simultaneously—and of his own volition, ap-

---

**2.** The Beneficiaries argue that we should focus on the language of the Restatement of Trusts. Although we certainly acknowledge that the Restatement offers useful guidance, our Supreme Court has cautioned that the Restatement is "not a statute whose precise wording is entitled to deference as an act of an equal branch of government." *PSI Energy, Inc. v. Roberts,* 829 N.E.2d 943, 958 (Ind.

2005), *abrogated on other grounds by Helms v. Carmel High Sch. Vocational Bldg. Trades Corp.,* 854 N.E.2d 345 (Ind.2006). Here, the General Assembly has enacted a statute governing the investment duties borne by trustees, and it is the words of the statute, rather than the words of the Restatement, that must guide our analysis herein.

parently—Roberson conducted his own review. Roberson eventually proposed to KeyBank that a John Hancock policy be purchased to replace the two VUL policies.

After Roberson made his proposal, Key-Bank again hired Oswald to conduct an independent review of the John Hancock policy. The fact that Roberson submitted the policy for review does not constitute a delegation of KeyBank's decisionmaking duties. Oswald was an outside, independent entity with no policy to sell or any other financial stake in the outcome. Under these circumstances, we do not find that KeyBank delegated any investment or other duties to Roberson. Although the Beneficiaries direct our attention to evidence in the record supporting their contention that there was, in fact, a delegation, this is merely a request that we reweigh the evidence—a request we decline.

### B. Oswald's Recommendations

■ The Beneficiaries next argue that KeyBank violated the PIA by disregarding Oswald's recommendations. As noted above, KeyBank first asked Oswald to review the existing VUL policies. After comparing the policies' respective hypothetical performances given hypothetical interest rates, Oswald rated both policies as a Category Three on a scale from one to five, noting that "additional future premiums may be required" and that the policies "should be audited every two to three years or more often" under certain circumstances. Appellants' App. p. 312–13, 315. KeyBank then asked Oswald to review the proposed John Hancock policy. Oswald found that no further premiums would be required to maintain that policy until Stuart reached the age of 100. Ultimately, Oswald recommended the purchase of the John Hancock policy, rating the policy as a Category One on a scale from one to five,

with one being the best. No further audits would be necessary. *Id.* at 334–35.

Having reviewed these reports, it is evident that Oswald found both options—the existing VUL policies and the John Hancock policy—to be palatable. Each had their own sets of pros and cons. The existing VUL policies may have lapsed before Stuart reached the age of 60 and would likely have required additional premiums to finance—money that Stuart no longer had. The John Hancock policy, on the other hand, offered a significantly reduced death benefit but was guaranteed to remain in force until Stuart reached the age of 100 and would require no additional financing. Oswald found the John Hancock policy to warrant the highest rating and concluded that no further audits would be necessary. Under these circumstances, we cannot say that KeyBank's decision to exchange the VUL policies for the John Hancock policy parted ways from Oswald's advice and recommendations. KeyBank merely chose between two relatively acceptable options—a decision it was entitled to make as trustee. We do not find that it acted imprudently on this basis.

### C. Investigation of Alternatives

■ The Beneficiaries next fault Key-Bank for failing to investigate alternatives aside from retaining the existing VUL policies or exchanging them for the John Hancock policy. It is very likely that, no matter what the circumstances, a trustee could always do more. Investigate further, engage in more brainstorming, expand the scope of its queries, etc. It is difficult, if not impossible, to draw a bright line demarcating the point at which a trustee has done enough from the point at which it must do more. Here, KeyBank was concerned about the state of the economy, the stock market, and Stuart's limited financial resources. It examined the viability of the existing policies and investi-

gated at least one other option. Of course it could have done more, but nothing in the record leads us to second-guess the trial court's conclusion that, while KeyBank's "process was certainly less than perfect," it was adequate. Appellants' App. p. 22–24. Thus, it was not clearly erroneous for the trial court to conclude that KeyBank did not act imprudently for this reason.

■ The Beneficiaries also argue briefly that KeyBank's conduct surrounding the 1999 Exchange violated the PIA. As noted above, at the time KeyBank assumed the duties of successor trustee, the underwriting for the exchange of policies had been approved and Stuart had already submitted to the physical exams. Indeed, the exchange had been contemplated since the summer of 1998. Furthermore, the transaction nearly doubled the total death benefit available under the trust. At trial, the Beneficiaries' experts testified that they had originally committed a calculation error with respect to the 1999 Exchange and, once the error was corrected, they believed that the risk factors associated with the 1999 Exchange were within the range of defensible possibilities. Appellee's App. p. 412–17. Under these circumstances, there is no evidence supporting the Beneficiaries' argument that KeyBank violated the PIA with its conduct in 1999.

### D.  No Hindsight

■ The PIA cautions that "[c]ompliance with the prudent investor rule is determined in light of the facts and circumstances existing at the time of a trustee's decision or action and not by hindsight." I.C. § 30–4–3.5–8. Here, at the time Key-Bank was evaluating its options before the 2003 Exchange, it was working with the following facts and circumstances: (1) a rapidly declining stock market; (2) the most recent two years, in which the Trust had lost progressively more money, with every reason to believe that further erosion would occur with every day it held the VUL policies; (3) a grantor in his early 50s with a life expectancy of 88 years; (4) a grantor who had lost a great deal of money because of the economic decline and, consequently, had no further funds to invest in the trust; and (5) a trust that consisted of two life insurance policies that an independent expert estimated could lapse within approximately five years if no further funds were invested.

Under these circumstances, KeyBank's decision to exchange the VUL policies for the John Hancock policy was eminently prudent, reduction in death benefit notwithstanding. That a "wait and see" approach may also have been a prudent course of action does not alter the propriety of the exchange. We now know, in hindsight, that the economy improved and Stuart died unexpectedly less than a year after the 2003 Exchange took place—given those facts, of course, we understand that the Beneficiaries wish that KeyBank had made a different decision. But keeping in mind only the facts and circumstances at the time KeyBank made its decision, we cannot say that its decision violated the PIA.

### III.  Trustee's Duties

■ The Beneficiaries next argue that even if KeyBank did not violate the PIA, it breached a number of its duties to them. A trust is a fiduciary relationship between a person who, as trustee, holds title to property and another person for whom, as beneficiary, the title is held. I.C. § 30–4–1–1(a). A "breach of trust" is a violation by the trustee of any duty that is owed to the beneficiary, with the duties being established by statute and by the terms of the trust. *Davis v. Davis*, 889 N.E.2d 374, 380 (Ind.Ct.App.2008). In relevant part, Indiana Code section 30–4–3–6 provides as follows:

(a) The trustee has a duty to administer a trust according to its terms.

(b) Unless the terms of the trust provide otherwise, the trustee also has a duty to do the following:

(1) Administer the trust in a manner consistent with [the PIA].

\* \* \*

(3) Preserve the trust property.

(4) Make the trust property productive for both the income and remainder beneficiary. As used in this subdivision, "productive" includes the production of income or investment for potential appreciation.

\* \* \*

(7) Upon reasonable request, give the beneficiary complete and accurate information concerning any matter related to the administration of the trust and permit the beneficiary or the beneficiary's agent to inspect the trust property, the trustee's accounts, and any other documents concerning the administration of the trust.

\* \* \*

(10) Supervise any person to whom authority has been delegated....

Furthermore, a trustee owes its beneficiaries a duty of accounting, which requires the trustee to deliver an annual written statement of the accounts to each income beneficiary or her personal representative. I.C. § 30–4–5–12(a). Finally, it is well established that a trustee "shall invest and manage the trust assets solely in the interest of the beneficiaries." I.C. § 30–4–3.5–5.

### A. Relationship to Beneficiaries

#### 1. Annual Reports

■ The record reveals that when the Beneficiaries were minors—as they were for most of the relevant period of time—KeyBank sent its annual reports to Stuart, their father. This was not a perfect solution, inasmuch as it was Vance, their mother, who was the custodial parent. But it establishes KeyBank's good faith, at the least. *Cf. Davis*, 889 N.E.2d at 383–84 (finding a breach of trust where trustee willfully withheld information from the beneficiaries and engaged in self-dealing).

At some point before the 2003 Exchange, one of the Beneficiaries turned eighteen. KeyBank inadvertently failed to send her a copy of the annual report at that time. Following her birthday, she requested documents from KeyBank. A KeyBank representative contacted the Beneficiary and Vance and indicated that the documents were ready at a local KeyBank office to be picked up. Yet again, therefore, we cannot conclude that there is any evidence that KeyBank willfully withheld information from the Beneficiary.

■ The Beneficiaries also argue that KeyBank breached its duties by failing to provide sufficient information regarding its plan to carry out the 2003 Exchange. We cannot agree, inasmuch as the Trust itself gave the trustee the power to surrender or convert the policies without the consent or approval of anyone: "The Trustee shall have all of the rights of the owner of such policies and, without the consent or approval of the Grantor *or any other person,* may sell, assign or hypothecate such policies and may exercise any option or privilege granted by such policies, including ... the right to ... surrender or convert such policies...." Appellants' App. p. 455 (emphasis added). There was no requirement, therefore, that KeyBank notify the

Beneficiaries of the impending exchange, inasmuch as neither their consent nor approval were required to carry out the transaction.

Even if we were to find that KeyBank's actions herein constituted a breach of its duty to the Beneficiaries, we cannot countenance the Beneficiaries' argument that the lack of receipt of an annual report or failure to provide information about the exchange, without more, supports an award of compensatory damages. For damages to be warranted, we can only conclude that causation must be established. The trial court found that "the receipt of timely financial reports by the Beneficiaries would not have changed the negative financial condition of the trust" and that the "lack of financial reporting to the Beneficiaries was not the proximate cause of damages to the Beneficiaries." Appellants' App. p. 22–24. There is certainly evidence in the record supporting those findings. We agree with the trial court that "financial trends outside of the control of the Trustee or the Beneficiaries were the direct and proximate cause of the problem facing the Trust in 2003," *id.*, and would add that another contributing problem beyond everyone's control was Stuart's tragic, untimely death. We simply cannot conclude that KeyBank's shortcomings vis a vis the provision of annual reports and other information to the Beneficiaries was a proximate cause of any damages to the Beneficiaries.

### 2. Duty of Loyalty

■ Next, the Beneficiaries argue that KeyBank somehow breached its duty of loyalty to them. The only evidence they point to in support of this argument is the fact that KeyBank had various contacts and communications with Stuart between 1999 and 2003. According to the Benefi-

ciaries, this evidence supports an inference that KeyBank was loyal to Stuart rather than to the Beneficiaries, as required by law. We cannot agree. A trustee must, as a practical matter, have contacts with the settlor. Appellee's App. p. 474. For example, if changes are going to be made to an insurance policy, those changes generally require that the settlor submit to a physical exam; therefore, such a change cannot be effectuated without communication between a trustee and settler. *Id.* Nothing in the law prohibits contact between a trustee and settlor, nor should it. Here, nothing in the record leads us to conclude that KeyBank breached its duty of loyalty to the Beneficiaries.

### B. Delegation

The Beneficiaries also argue that KeyBank breached its duties to them by delegating certain decisionmaking functions to Roberson without adequate oversight. As discussed above, however, the record supports a conclusion that, in fact, no such delegation occurred. Furthermore, KeyBank engaged its own independent expert to evaluate the VUL policies and the John Hancock policy that was suggested by Roberson. Under these circumstances, we do not find that KeyBank breached its duties to the Beneficiaries in this regard.

### C. Grantor's Intent

■ Finally, the Beneficiaries argue that the trial court erroneously concluded that the 2003 Exchange was consistent with Stuart's intent. The primary goal in construing a trust document is to ascertain and effectuate the intent of the settlor, which may be determined from the language of the trust instrument and matters surrounding the formation of the trust. *Malachowski v. Bank One*, 590 N.E.2d 559, 565–66 (Ind.1992). The Beneficiaries

suggest that the trial court was improperly considering Stuart's acts or requests made after the trust was executed in reaching that conclusion. We cannot agree, however, inasmuch as the trial court explicitly concluded as follows: "Had the insurance policies lapsed, the Beneficiaries would have received no distribution from the Trust. Certainly that outcome was not within the intent of the Settlor *at the time he established the Trust.*" Appellants' App. p. 22–24 (emphasis added). Nothing in the record suggests that the trial court was clearly erroneous in reaching that conclusion, and we decline to disturb its ruling for this reason.

## CONCLUSION

In sum, we find that the trial court did not erroneously conclude that, while Key-Bank's decisionmaking process and communication with the Beneficiaries was not perfect, it was sufficient. Although it is tempting to analyze these cases with the benefit of hindsight, we are not permitted to do so, nor should we. KeyBank chose between two viable, prudent options, and given the facts and circumstances it was faced with at that time, we do not find that its actions were ·imprudent, a breach of any relevant duties, or a cause of any damages to the Beneficiaries.

The judgment of the trial court is affirmed.

NAJAM, J., and KIRSCH, J., concur.