**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jun 14 2012, 9:21 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**RUSSELL T. CLARK, JR.**
Emswiller Williams Noland & Clarke, PC
Indianapolis, Indiana

ATTORNEY FOR APPELLEES:

**R. LEE MONEY**
Greenwood, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE ADOPTION
OF M.L.B.,                                  )
                                            )
M.D.B.,                                     )
                                            )
    Appellant-Petitioner,                  )
                                            )
        vs.                        )    No. 41A05-1107-AD-363
                                            )
K.J.R. and P.L.R.,                          )
                                            )
    Appellees-Respondents.                 )

APPEAL FROM THE JOHNSON SUPERIOR COURT
The Honorable Kevin M. Barton, Judge
Cause No. 41D01-1004-AD-18

**June 14, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

M.D.B. ("Father") appeals from the trial court's order granting P.L.R.'s ("Stepfather") petition to adopt M.L.B. ("the Child"). Father presents several issues for our review, which we consolidate and restate as follows:

I.      Whether the trial court incorrectly concluded that Father's consent to the adoption was not required; and

II.     Whether the trial court erroneously granted Stepfather's petition to adopt the Child.

We affirm.

## FACTS AND PROCEDURAL HISTORY

The Child was born out-of-wedlock on October 11, 2004 to K.J.R. ("Mother") and Father. Mother, Father, and the Child lived together in Father's home for the first three months after the Child's birth. When Mother and Father's relationship deteriorated, Mother and the Child moved out of Father's house and into the maternal grandfather's house. Mother began a relationship with Stepfather, and they married in 2006.

After moving out of Father's house, Mother allowed Father regular and frequent visits with the Child, either every other weekend, or a couple of evenings during the week. The relationship between Mother and Father further deteriorated to the point that Mother obtained a restraining order against Father, which expired sometime in 2006. Mother and Father verbally agreed at that time that Father could exercise parenting time visitation with the Child every other weekend.

Father exercised parenting time with the Child until a dispute arose on Mother's Day 2007, after which Mother requested that Father's visits be supervised by M.A.B.

2

("Grandfather"), the Child's paternal grandfather. Father did not have a permanent place of residence and had made threats of harm against Mother and himself. When Father refused to agree to supervised visitation, Mother suggested that Father petition the trial court for parenting time. In January 2008, Father petitioned the trial court to establish paternity. On April 28, 2008, the trial court entered a judgment of paternity and support, which also provided that either party could petition the trial court on the issue of visitation. Although Father did not petition the trial court for an order of visitation, Mother allowed the Child to visit with Grandfather, as well as Father's extended family, with the agreement that Father would not be present at these events. The Child attended several of Father's family's functions in 2007, 2008, and 2009; however, after the Child's third birthday party in 2007, Father had virtually no interaction with the Child for the next three years.

On April 19, 2010, Stepfather filed a petition for adoption of the Child. Father filed a motion to contest the adoption. Grandfather's subsequent motion to intervene in the adoption was granted by the trial court. Grandfather later filed a verified petition to establish grandparent visitation rights and then moved to consolidate the adoption and visitation actions. The trial court denied the motion to consolidate the actions for trial, but heard evidence on both causes contemporaneously. The trial court ultimately awarded Grandfather visitation rights[1] as to the Child pursuant to Indiana Code Section 31-17-5-1 prior to entering an order on the adoption petition. The trial court also entered an order granting Stepfather's petition to adopt the Child. Father now appeals. Additional facts will be supplied.

---

[1] We decide the appeal from that order in a separate opinion.

3

# DISCUSSION AND DECISION

## Standard of Review

Generally, when, as here, a trial court enters findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A), we apply a two-tiered standard of review; first we determine whether the evidence supports the findings, and second, whether the findings support the judgment. *Davis v. Davis*, 889 N.E.2d 374, 379 (Ind. Ct. App. 2008). In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. *Id*. We do not reweigh the evidence, but consider only the evidence favorable to the trial court's judgment. *Id*. Those appealing the trial court's judgment must establish that the findings are clearly erroneous. *Id*. Findings are clearly erroneous when a review of the record leaves us firmly convinced that a mistake has been made. *Id*. We do not defer to conclusions of law, however, and evaluate them *de novo*. *Id*.

Likewise, the appropriate standard of review on appeal from an adoption petition that has been granted is to consider the evidence most favorable to the petitioner and reasonable inferences which can be drawn therefrom to determine whether sufficient evidence exists to sustain the trial court's decision. *Irvin v. Hood*, 712 N.E.2d 1012, 1014 (Ind. Ct. App. 1999). We will not disturb the trial court's decision in an adoption proceeding unless the evidence adduced at trial leads to but one conclusion and the trial court reached the opposite conclusion. *Id*. On review, we do not reweigh the evidence, but examine the evidence most favorable to the trial court's decision. *Id*.

4

# I. Consent to Adoption

Father contested Stepfather's petition to adopt the Child. The trial court determined that Stepfather had proven by clear and convincing evidence that Father's consent was not required as he had waived the requirement of consent by failing to provide for the care and support for the Child when he was able to do so as required by law or judicial decree for a period of at least one year. Father contends that the trial court erred by so finding.

Indiana Code section 31-19-9-8(a)(2), which is written in the disjunctive, provides, in pertinent, that consent to adoption is not required when:

> A parent of a child in the custody of another person if for a period of at least one (1) year the parent:
> (A) fails without justifiable cause to communicate significantly with the child when able to do so; or
> (B) knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree.

The petitioner's burden of proof is clear and convincing evidence that consent is not required under Indiana Code section 31-19-9-8(a)(2). *In re Adoption of M.A.S.*, 815 N.E.2d 216, 220 (Ind. Ct. App. 2004). Although the burden of proof by "clear, cogent, and indubitable evidence" has been cited as the appropriate burden of proof in other cases, we have concluded that the clear and convincing evidence standard is the appropriate burden of proof for an adoption without consent. *See In re Adoption of M.B.*, 944 N.E.2d 73, 76-77 (Ind. Ct. App. 2011). As stated in *In re Guardianship of B.H.*, 770 N.E.2d 283, 287 (Ind. 2002), when applying this standard:

> in reviewing a judgment requiring proof by clear and convincing evidence, an appellate court may not impose its own view as to whether the evidence is clear and convincing but must determine, by considering only the probative

evidence and reasonable inferences supporting the judgment and without weighing evidence or assessing witness credibility, whether a reasonable trier of fact could conclude that the judgment was established by clear and convincing evidence.

The trial court found that Mother successfully prevented Father from communicating with the Child and declined to find that Stepfather had met his burden of establishing a failure to communicate with the Child on the part of the Father. Neither party challenges this finding and conclusion of the trial court. While Father does not contest the trial court's conclusion that Father clearly did not make child support payments for more than a year, he does contest the trial court's conclusion that he had the ability to pay support, yet failed to do so.

Father argues that the trial court erred in several respects in its evaluation of Father's income. The pertinent findings and conclusions follow:

FINDINGS OF FACT

. . . .

24. [Father] testified that in 2007 he was living with a girlfriend []. [Father] and [the girlfriend] broke up as a result of an incident in which [the girlfriend] was arrested. [Father] testified that [Mother] told him that if he and [the girlfriend] got back together again, he would never see [the Child] again. [Father] testified that three or four months later, he reconciled with [the girlfriend]. He has not seen [the Child] since that time.

. . . .

29. In parts relevant, the Judgment of Paternity and Support provided:

"Custody and Visitation 3. That custody of the child(ren) is granted to the mother, . . . . This Court (is) not deciding (the) issue of visitation. Either party may praecipe with the Circuit Court on the matter.

6

Child Support 4.  That the non-custodial parent is hereby ordered to pay current child support for the minor child(ren) in the amount of $81.00 per week, effective 5/9/08 . . . .

5.  That the non-custodial paren[t] owes past-due support in the amount of $1,053 as of the date of this judgment.  (This amount considers a credit of $0 in support previously provided by the non-custodial parent since the effective date of the order.)  In addition to the current support ordered in paragraph 4, the non-custodial parent is hereby ordered to pay said past-due support by income withholding through the Marion County Clerk at the rate of $9.00 per week."  (The retroactive establishment of child support would have established the child support obligation with the week ending February 8, 2008.)

. . . .

35.  A Child Support docket from the Office of the Clerk of Marion County was introduced into evidence.  The Child Support docket showed that three (3) payments of child support were made in 2008 in the total amount of Three Hundred Ninety Dollars ($390.00).  Fifty Dollars ($50.00) was paid on May 15, 2008.  Eighty Dollars ($80.00) was paid on May 15, 2008.  Two Hundred Sixty Dollars ($260.00) was paid on June 12, 2008.

36.  The next payment that was received was on August 3, 2009.  Three Hundred Sixty Dollars ($360.00) was paid in child support in 2009.  One Hundred Twenty Dollars ($120.00) was paid on August 3, 2009, Sixty Dollars ($60.00) was paid on August 10, 2009, Sixty Dollars ($60.00) was paid on August 14, 2009, Sixty Dollars ($60.00) was paid on August 21, 2009 and Sixty Dollars ($60.00) was paid on August 28, 2009.  No other payments were made in 2009.

37.  The pending adoption was filed on April 19, 2010.  On April 21, 2010, [Father] paid Five Hundred Dollars ($500.00) on child support.  [Father] has paid child support regularly thereafter.  As of December 10, 2010, payments had been made in the amount of One Thousand Seven Hundred Eighty Dollars ($1,780.00).  Weekly payments have typically been in the amount of Twenty-Five Dollars ($25.00) or Thirty Dollars ($30.00) per week since April 21, 2010.

38.  [Father] did not pay any child support to [Mother] after the establishment of the Child Support Docket except those amounts paid through the Clerk of Marion County.

7

39. The evidence as to the payment of child support prior to the entry of the Judgment of Paternity and Support and the establishment of the Child Support Docket is spotty. The evidence that was provided is that [Father] did pay child support to [Mother] when he was getting visitation, however, he did not pay child support to [Mother] when she would not let him have visitation. No evidence was presented as to child support paid prior to 2008. From the evidence presented, a one (1) year period of non-payment of child support was not established prior to the establishment of the child support obligation for the week ending February 8, 2008. Accordingly the Court will only consider the period after February 8, 2008.

40. [Father] testified that he ended his high school education in the tenth grade when his school guidance counselor suggested that he should consider leaving school and going to work for his father's business. [Father] has not pursued any educational opportunities since dropping out of high school. [Father] has been employed as a heavy equipment operator for various employers. In August of 2006, [Father's] ankle was run over by a piece of heavy equipment, which shattered the ankle. [Father] began a [long] period of rehabilitation. [Father] testified that he continues to suffer pain from the 2006 injury. In late 2007, [Father] regained employment with his father's excavating company. [Father] had been earning Five Hundred Dollars ($500.00) per week while employed by his father's company.

41. In late 2007 through June of 2008, [Father] was living at [a family residence in] Indianapolis, Indiana. The property is owned by [Father's] family. The sum of One Hundred Dollars ($100.00) per week was deducted from [Father's] paycheck to pay for rent. In the late 2007 and early 2008 time frame, [Father] lived at the property with a girlfriend, [], and her two children. [Father] moved when the property flooded in June of 2008. [Father, his girlfriend,] and her two children went to live with a friend of [girlfriend, friend].

42. According to [Father], the arrangement with [the friend] was that [Father and his girlfriend] would help around the house and would assist in child care. [Father] denied paying any financial compensation to [the friend] for living in her house. However, [the girlfriend] testified that [the friend] was paid One Hundred Dollars ($100.00) per week while they lived with [the friend]. [Father and the girlfriend] lived with [the friend] until he left to move in with his father in late 2008.

8

43. [Father] was involved in a motor vehicle accident on December 31, 2007. [Father] sustained injuries of three herniated discs. As a result of the accident, [Father] was unable to return to work. [Father] testified that he received three additional paychecks from the family business for work that he had performed in 2007 in January of 2008.

44. [Father] testified that he received unemployment compensation in 2008 although the period for payment of benefits and the amounts received were not established. [Father] testified that he could not receive unemployment benefits for part of 2008 due to his injuries.

45. [Father] testified that he received a settlement from a prior injury subject to a Workmen's Compensation claim in the amount of Six to Seven Thousand Dollars in late 2008.

47.[sic] [Father] used Three Thousand Five Hundred Dollars ($3,500.00) of the settlement amount to pay a deposit and four months rent on a house. He moved into the residence with [the girlfriend] and her two children. [Father] testified that he was evicted from this residence in March of 2009.

48. [Father] also repaid his father money that he had borrowed from his father for living expenses in the amount of Three to Four Thousand Dollars. In addition, [Father] testified that he saved a Thousand Dollars to apply upon a retainer fee for an attorney in order to obtain visitation with [the Child]. However, he was unable to find an attorney who could be engaged with such a retainer, and the funds were ultimately used for living expenses. None of the money was used for the child support obligation to [the Child].

49. At the time of the Agreed Judgment of Paternity and Support on April 28, 2008, [Father] reported that he earned Five Hundred Dollars ($500.00) per week. He signed the Child Support Obligation Worksheet that he affirmed under the penalties of perjury that the foregoing declarations were true. The Eighty-One Dollars ($81.00) per week child support obligation was computed on the basis of [Father's] income of Five Hundred Dollars per week. However, [Father] testified at [the] hearing that he was in fact not working when he signed the child support worksheet. The evidence does not disclose why [Father] signed a child support agreement based upon a false income figure.

50. In December of 2008, [Father] was hired by Ziebart. Initially, he was paid hourly at the rate of Eight Dollars ($8.00) per hour. After a couple of

9

weeks, the income was based upon the work performed. According to [Father], the effective hourly rate dropped to about Seven Dollars and Twenty-Five Cents ($7.25) per hour inasmuch as there wasn't much work coming in.

51. On February 13, 2009, [Father] slipped and fell while working at Ziebart and injured his shoulder. As a result of his injury, [Father] was unable to return to work.

52. In early March of 2009, [Father] attempted to return to Ziebart. However, his employment with Ziebart was terminated at that time. According to [Father] he attempted to explain to a new supervisor that work was slow. [Father] testified that the new supervisor decided that [Father] should be discharged from employment with Ziebart.

53. Following termination, [Father] attempted to obtain unemployment compensation. He was initially denied, and he appealed the denial. Although the record is somewhat unclear, [Father] apparently did not receive unemployment benefits but he was approved for workmen's compensation benefits.

54. [Father] received workmen's compensation benefits of Two Hundred Twenty-Two Dollars and Twelve Cents ($222.12) every two weeks beginning in March of 2009 as a result of his injury at Ziebart. The workmen's compensation continued until November of 2009.

55. [Father] had surgery for his injury from Ziebart in August of 2009. He commenced rehabilitation after his surgery.

56. [Father] lived with [the girlfriend] and her two children for approximately two years. [Father] testified that while he and [the girlfriend] lived together [the girlfriend] worked some of the time. [The girlfriend] worked cleaning houses. [Father] testified that he supported [the girlfriend] and her two children when she was not working. [Father] testified:

Q. During that period of time (the two years that [Father] and [the girlfriend] were living together) did [the girlfriend] work part of the time but didn't work part of the time?

A. She worked on and off, yes.

Q. During the time that they were living with you who supported those children if she wasn't working?

A. I did. I paid all the bills and groceries. I struggled to make ends meet.

Q. What years were those that you were living together with her?

10

A.     Let's see, I've been single for a year and a half, so I met her in 07. I don't remember the exact date, so

Q.     Did you live with her after 2008?

A.     Yes, I did.

Q.     You lived with her and supported her children after you had agreed and been ordered to pay child support for [the Child]?

A.     Yes. I was the primary person who paid the bills, the rent, the groceries. Other than that, [one child's] dad paid child support for his schooling and [the other child's dad] had paid for [that child's] clothing and things like that. My money went toward rent, utilities, bills and groceries."

Deposition of [Father], page 64, line 4 to page 65, line 1.

54.   [Father] testified that in 2008, he earned approximately Five Hundred Dollars ($500.00) from the sale of firewood that had been obtained from a friend's family. In addition, he received income of no more than One Thousand Dollars ($1,000.00) from performing odd jobs for his grandfather and father.

57.[sic]  In the first half of 2008, [Father] and [the girlfriend] received food stamps in the amount of Four Hundred Dollars ($400.00) per month. The food stamps provided the funding from which food was purchased for the household. The food stamps ended in June of 2008. No explanation was provided for the reason for the end of the foodstamps.

58.     [The girlfriend] received child support from the fathers of her two children, which was used to provide for the support of the two children.

59.     [Father] testified that he also paid co-payments for doctor visits and for prescription expenses during this time period in the amount of from Ten to Forty Dollars. The money received from his father and grandfather was used to pay for the medical co-payments. No evidence was submitted as to the source of the insurance that permitted [Father] to only make co-payments. Presumably, the 2006 and 2009 injuries were subject to coverage by the workman's compensation carrier.

60.  After [Father] and [the girlfriend] were evicted from the house that had been rented in Beech Grove, he and [the girlfriend] again moved to the residence of [the girlfriend's friend]. [Father] testified that he paid one-half of his workman's compensation benefits or approximately One Hundred Elev[e]n Dollars ($111.00) every two weeks for rent to [the friend].

11

61. [Father] and [the girlfriend] subsequently separated, and [Father] returned to the family[-]owned property [in Indianapolis]. Although the date is not established, the evidence suggests that the time period was the middle of 2009. [Father] has lived at [that residence] thorough the hearing.

62. In the Fall of 2010, [Father] did some work for a [man] in Carmel. [Father] ran bulldozers and did some grading work around [the man's] yard. [Father] got his job through [the man's] contact with [Father's] father over the summer of 2010. [Father] testified that he had been released to return to work in August of 2010.

CONCLUSIONS

. . . .

13. The Court moves to the second prong. [Father] failed to provide for the support of [the Child] for a period in excess of a year.

14. The Court begins by noting that evidence does not support the payment of support or lack of payment of support prior to February 8, 2008, which is the date of commencement of the retroactive child support obligation by the agreed Judgment of Paternity and Support on April 28, 2008. (Although the support docket was not established [until] after entry of the agreed entry, the parties agreed by the terms of the agreed entry that a child support arrearage existed and that [Father] had made no payments on the arrearage.) The Child Support docket[] shows a gap of child support payments from June 12, 2008 through August 3, 2009. Although [Father] clearly did not make child support payments for a period in excess of a year [, the] issue is not so simple as simply determining if child support had been paid.

. . . .

18. The Court looks at [Father's] income during the 2008 and 2009 time frame. After the automobile accident on December 31, 2007, [Father] received three additional weekly paychecks from his father's excavating company. [Father] was again employed in December of 2008. During the period from February, 2008 until his employment in December of 2008, [Father] identified four sources of funds: (1) income from the sale of firewood, which was estimated to be about Five Hundred Dollars ($500.00); (2) income from odd jobs from his grandfather and father which was estimated to be less than One Thousand Dollars ($1,000.00); (3) the workman's compensation lump sum payment and (4) public assistance in the form of food

12

stamps in the sum of Four Hundred Dollars ($400.00) per month. As for the workman's compensation lump sum payment, [Father] testified that he received a sum of Six to Seven Thousand Dollars ($6,000.00 - $7,000.00). However, in describing what he did with the money, the amount disposed of had increased to Seven Thousand Five Hundred Dollars to Eight Thousand Five Hundred Dollars ($7,500.00 -$8,500.00). The Court uses the median figure of Seven Thousand Two Hundred Fifty Dollars ($7,250.00) for the lump sum workmen's compensation payment. [Father] also identified non-income benefits including occupancy of the residence with [girlfriend's friend] without charge of rent. He also noted that assistance in paying expenses came from [the girlfriend's] employment when she was working. Child support payments were also received for [the girlfriend's] children.

18.[sic]  [Father] became employed at [Ziebart] in December, 2008, although the exact date is unknown. He remained employed until he was injured on February 13, 2009. [Father] initially earned $8.00 per hour, which was then reduced to an effective rate of about Seven Dollars and Twenty-Five Cents ($7.25) per hour. Beginning in March of 2009, [Father] received workmen's compensation benefits in the amount of Two Hundred Twenty-Two Dollars and Twelve Cents ($222.12) every two weeks until November of 2009.

19.  In assessing [Father's] income, [Father] had cash income of approximately Eleven Thousand Five Hundred Dollars ($11,500.00) during the crucial period from June 12, 2008 through August 3, 2009. (Pursuant to the Indiana Child Support Guidelines, workmen's compensation benefits are considered as income and food stamps are not considered as income.) In addition, the Indiana Child Support Guidelines state[] that "in-kind benefits" such as free housing are to be included as income. Guidelines 3. [Father] received free in-kind housing for the months of June through November, 2008. Although the reasonable value of the housing received in these months is not established, [Father] did pay rent of $875.00 for the months of December, 2008 through March, 2009 for himself, [the girlfriend] and her two children. He paid rent of $111.11 biweekly beginning in April, 2009. The Court therefore uses a median figure of $550.00 per month for the months of February through November, 2008. The Court therefore determines that [Father] had cash and in-kind income of Seventeen Thousand Dollars ($17,000.00) for the period from February, 2008 through August, 2009. At seventy-eight (78) weeks, weekly income for [Father] as used for purpose of the Indiana Child Support Guidelines was Two Hundred Eighteen Dollars ($218.00).

. . . .

21. In the crucial period from June, 2008 through August, 2009, the Court examines the expenses incurred by [Father]. [Father] testified that he incurred expenses for food, utilities, gasoline for transportation, doctor co-pays, physical therapy co-pays, prescription co-pays and personal hygiene items. In addition, [Father] testified that he incurred expenses for shelter during part of the period.

22. As for lodging, [Father] testified that in June, 2008, he and [the girlfriend] moved to the residence of [the girlfriend's friend]. [Father] testified that no rent was paid at this time, although [the girlfriend] testified to rent of One Hundred Dollars ($100.00) per week. Subsequently, in 2008, [Father] moved in with his father for a couple of months. No rent was paid. In December, 2008, [Father] did pay for a deposit and four months rent for a house in the amount of Three Thousand Five Hundred Dollars ($3,500.00). He was evicted in March of 2009. [Father] testified that he, [the girlfriend] and her children moved back into the residence owned by [girlfriend's friend]. He commenced paying rent in the amount of one-half of his workman's compensation benefits or One Hundred Eleven Dollars ($111.00) every two weeks. [Father] then returned to the residence owned by his family [ ] after his relationship with the girlfriend ended. No evidence was presented of any rent being paid to his family for the occupancy of the residence. The evidence supports a finding of an expenditure for rent of approximately Four Thousand Dollars ($4,000.00).

23. [Father] testified to the expense of utilities, although no evidence was presented of the amount of utility payments. Inasmuch as part of the time was spent living with his father, in the family owned residence or with [the girlfriend's friend], it is unclear whether utilities [expenses] were being incurred during these periods of time.

24. [Father] testified that he incurred co-pay amounts for doctor visits, physical therapy visits and prescriptions ranging from Ten to Forty Dollars. Evidence does not establish the frequency of the doctor visits, physical therapy and prescriptions during this period of time. The evidence does establish[] that [Father] was receiving care for the back injuries sustained from the December 31, 2007 car accident as well as the shoulder injury sustained at Ziebart in February, 2009 during the period of time. [Father] testified to continued problems with his ankle from the 2006 injury, although the evidence is unclear if the 2006 injury required any additional physician visits or physical therapy in 2008 and 2009. No total amount for medical expenses was established.

25. No evidence was presented as to the amount incurred for food, transportation expenses or personal hygiene items. Although [Father] testified that food stamps were received in 2008 until June, he testified that his food stamp assistance ended in June of 2008. Hence, the food expense was an additional expense to [Father] during the critical period of February, 2008 through August, 2009.

26. While total expenses are not established, evidence was received on spending patterns. [Father] testified that he used marijuana, and that he had funds available from which to purchase marijuana. Although no evidence established the total amount spent [o]n marijuana, the use was not just occasional. Purchase of marijuana would be considered a discretionary expenditure.

27. Furthermore, [Father] testified that he paid for the 'rent, utilities, bills and groceries' for [the girlfriend] and her two children. Insofar as he is providing for the support of three dependents, he does have discretionary income.

28. Based upon [Father's] spending, there is evidence of discretionary spending. Due to this evidence, [Father's] basic needs are therefore being met. There is evidence that [Father] is operating at a higher level from a minimum personal subsistence level.

29. In the Commentary to the Indiana Child Support Guidelines, there is stated: " Economic data indicates one hundred dollars, which is half of the 2008 federal poverty level for one person, is not sufficient for a person to live at a subsistence level today." Commentary to Guidelines 2 of the Indiana Child Support Guidelines.

30. Based upon the Court's determination of weekly income and in-kind income of Two Hundred Eighteen Dollars ($218.00) during the period from February, 2008 through August, 2009, [Father's] income was above the 2008 federal poverty level for one person. Hence, [Father's] income is above a subsistence level from which the Court could have determined that he could not be made to contribute to the support of [the Child].

. . . .

32. The Court does disregard the Eighty-One Dollars ($81.00) per week child support obligation that was entered by the Marion Circuit Court. The amount was clearly established with utter disregard of the facts, i.e., that

15

[Father] was in fact not earning $500.00 per week. However, using the income figure that the Court has computed of Two Hundred Eighteen Dollars ($218.00) per week, a child support obligation of Forty-One Dollars ($41.00) per week would result based upon the assumption that [Mother's] financial information remains the same as set forth in the April 28, 2009 computation and [Father's] income is revised to the figure determined by the Court.

33. The Court notes that the Commentary to Guidelines 2 of the Indiana Child Support Guidelines provides that: "Therefore, the revised low-income adjustment sets the obligation amount for combined weekly incomes of $100.00 at $12.00 for one child." Hence, Indiana does recognize an obligation even for extremely low income situations to contribute to the support of a child. Here, [Father] did have greater income.

34. While [Father's] expenses are not established, there is no evidence that his expenses deviated from standard expenses of a parent so as to require a deviation of child support under the Indiana Child Support Guidelines. Indiana would recognize an obligation to provide for the support of a child from individuals with income such as [Father's] income.

35. While the Court does acknowledge that [Father] may not have been able to contribute much to [the Child's] support, [Father] did nonetheless have the obligation as well as the ability to contribute to [the Child's] support during the period from February, 2008 through August, 2009.

36. The Court does find that the [Stepfather] has proven by clear and convincing evidence that [Father] knowingly failed to provide for the care and support of [the Child] w hen able to do so as required by law or judicial decree. Accordingly, [Father's] consent to the adoption of [the Child] is not required.

*Appellant's App.* at 21-33.

Father argues that the trial court erred by imputing income to Father based upon his living arrangements after the Child was born. More specifically, Father claims that the trial court erred by imputing income of $550.00 per month for ten months when Father was living rent-free with friends or in a residence owned by his family. Father asserts that he was not unemployed or underemployed for the purpose of avoiding child support, and as such, there

16

were no grounds for imputing income, citing *Trabucco v. Trabucco*, 944 N.E.2d 544 (Ind. Ct. App. 2011). He further argues that imputing the value of the free housing was improper because it was not an in-kind payment incident to employment under Indiana Child Support Guideline 3(A)(2).

Indiana Child Support Guideline 3 pertains to the determination of the child support amount. Subsection (A)(1) defines weekly gross income and the list is non-exhaustive. Father correctly notes that Indiana Child Support Guideline 3(A)(2) does link certain in-kind benefits, such as free housing, with the parent's employment. Admittedly, the trial court's usage of the term in-kind benefit in Conclusion 19 to describe Father's living arrangement has confused the matter here. However, the decision to impute the income is valid nonetheless. The Commentary to Guideline 3A provides as follows:

> d. Imputing Income. Whether or not income should be imputed to a parent whose living expenses have been substantially reduced due to financial resources other than the parent's own earning capabilities is also a fact-sensitive situation requiring careful consideration of the evidence in each case. It may be inappropriate to include as gross income occasional gifts received. However, regular and continuing payments made by a family member, subsequent spouse, roommate or live-in friend that reduce the parent's costs for rent, utilities, or groceries, may be the basis for imputing income. The marriage of a parent to a spouse with sufficient affluence to obviate the necessity for the parent to work may give rise to a situation where either potential income or imputed income or both should be considered in arriving at gross income.

The commentary set forth above clearly contemplates consideration of continuing payments made by family members, roommates, or live-in friends toward rent, utilities, or groceries, as imputed income where the payments substantially reduce living expenses. Assuming without deciding that the trial court erred in calling the free housing an in-kind benefit, the trial court

17

did not err in its characterization of Father's living arrangements and decision to impute the income.

Father's reliance on this court's decision in *Trabucco* does not alter our decision here. Father cites to *Trabucco* for the proposition that where "a parent is unemployed or underemployed for a legitimate purpose other than avoiding child support, there are no grounds for imputing potential income." 944 N.E.2d at 544. Father claims that he was unemployed, not for the purpose of avoiding child support, but rather, because of numerous incidents leading to various physical injuries. He argues that the trial court therefore, was without authority to impute income per the holding in *Trabucco*. The trial court's decision, however, was not based upon Father's employment and any work-related benefits, but upon Father's receipt of free or reduced-cost housing out of the generosity of family and friends. It is proper for a trial court to impute income based upon rent-free living arrangements. *See Glass v. Oeder*, 716 N.E.2d 413, 417 (Ind. 1999) (trial court correctly imputed income based on rent-free living arrangement). The trial court did not err.

Father also claims that the trial court abused its discretion by finding that he had discretionary income and the ability to pay child support. Again, Father stresses that he was unemployed due to injuries. Father argues that his income was at a subsistence level with sporadic additional income from worker's compensation or an insurance settlement, thus, there was insufficient evidence that he had discretionary income. Father claims that he did not have the ability to support the Child during the relevant time period.

18

Father contends that the trial court considered the wrong time frame when making its findings and conclusions, and cites to *In re the Adoption of M.B.*, 944 N.E.2d 73 (Ind. Ct. App. 2011) to support his argument. Father claims that the relevant time frame that should have been considered was from June 2008 until August 2009. He argues that the trial court incorrectly imputed income for rent by including rent from February to November of 2008. He argues the trial court erred by calculating his income from February 2008 until August 2009.

*In re Adoption of M.B.* is a case in which a panel of this court considered the trial court's determination that father's consent to the child's adoption was necessary as the father had provided child care one day a week reducing mother's day care expenses. The trial court considered such child care as evidence of father's support for the child. In a footnote, we acknowledged that we would limit our review of father's work history to the year immediately preceding the filing of the petition for adoption and cited to Indiana Code section 31-19-9-8(a)(2)(B) in support. 944 N.E.2d at 75 n.1. While we do not disagree with the decision to so limit the review on father's work history in that case, we acknowledge that the statute does not mandate such a limitation. *See In re Adoption of Subzda*, 562 N.E.2d 745, 750 n.3 (Ind. Ct. App. 1990) (one-year period of non-communication with child not statutorily required to immediately precede filing of petition). We decline to find trial court error in the present case to the extent it is premised on a consideration of work history and income prior to the one-year period immediately preceding the filing of the adoption petition.

It is uncontradicted that Father did not pay support, although required to by court order, for the period of June 12, 2008 through August 3, 2009. The record supports the trial court's finding and conclusion that Father failed to support the Child for at least a one-year period. Furthermore, Father made no payments from August 28, 2009 through April 20, 2010, an additional eight-month period.

In so concluding, the trial court acknowledged that child support cannot be set in an amount that deprives the obligor of the means of self support at a subsistence level. The trial court concluded that Father was operating at a higher level than a minimum personal subsistence level. In support of that conclusion was the evidence that Father supported the girlfriend and her two children by paying rent and other bills. Father received a settlement or worker's compensation in an amount established by the range of the evidence at $7,250.00 and had enough income to purchase marijuana on a more-than-occasional basis. The trial court noted that the language in the commentary to the child support guidelines indicates that $100.00 a week, half of the 2008 federal poverty level for one person, was not sufficient for a person to live at subsistence level. The trial court discounted the child support figure arrived at in the Marion County proceedings because Father had agreed to that amount based upon an erroneous representation of his weekly income. The trial court then arrived at the figure of $218.00 in weekly income and concluded that Father had income from which he could have contributed to the support of the Child, even if that contribution was slight.

The evidence in the record supports the trial court's findings, and those findings, in turn, support the trial court's conclusions. To the extent that Father asks us to reconsider the

evidence presented of his medical and other expenses, we decline to do so. We do not reweigh the evidence, but examine the evidence most favorable to the trial court's decision together with reasonable inferences drawn therefrom, to determine whether sufficient evidence exists to sustain the decision. *Matter of Adoption of Marcum*, 436 N.E.2d 102, 103 (Ind. Ct. App. 1982). The trial court did not abuse its discretion.

## II. The Child's Best Interests

Father claims that the trial court erred by granting Stepfather's petition for adoption without Father's consent. In particular, Father contends that the trial court abused its discretion in concluding that adoption of the Child by Stepfather was in the Child's best interest. Father notes that "the parent child relationship is one of the most valued relationships in our culture." *Appellant's Br.* at 27 (citing *Tillotson v. Clay Cnty. Dep't of Family & Children*, 777 N.E.2d 741, 745 (Ind. Ct. App. 2002)). While we certainly do not disagree with that proposition, our focus here is on the best interest of the Child. The purpose of our adoption statutes is to protect and promote the welfare of children through the provision of stable family units. *In re Adoption of K.F.*, 935 N.E.2d 282, 289 (Ind. Ct. App. 2010). "[T]he best interest of the child is paramount and our main concern should lie with the effect of the adoption on the reality of the minor child's life." *Id.*

The decision of the trial court is presumed to be correct, and it is the appellant's burden to overcome that presumption. *In re Adoption of Childers*, 441 N.E.2d 976, 978 (Ind. Ct. App. 1982). Indiana Code section 31-19-11-1(a)(1) provides that when a trial court has

21

heard evidence that granting the petition for adoption is in the best interest of the child the trial court shall grant the petition for adoption and enter an adoption decree.

The trial court made the following findings and conclusions in regard to the Child's best interests:

FINDINGS OF FACT

. . . .

8. [Mother] and [Stepfather] had known each other since attending high school together, and they became romantically involved after [the Child's] birth. They were subsequently married on March 19, 2006.

. . . .

34. Except for the disputed February, 2010 meeting, [Father] has not seen the Child for in excess of three (3) years.

. . . .

63. [Stepfather] and [Mother] have lived together with [the Child] since [the Child] was approximately six (6) months old.

64. [Stepfather] is employed as a technician by Cummins Engine Company in Columbus, Indiana. He has obtained an Associate's degree in mechanical engineering technology while he was employed full time.

65. [Stepfather] testified that the [] family lives in a three bedroom single family house. He testified that the house has a yard with mature trees in which the children may play.

67.[sic] [Stepfather] testified that he works days. He normally returns home of an evening by 5:00 P.M. to 5:30 P.M. on a workday. The family has dinner within twenty (20) minutes of his arrival. After dinner, he will play with the children, including [the Child], until the children's bedtime at between 7:30 P.M. and 8:00 P.M. [Stepfather] testified that he works with [the Child] to help him learn to read and write. He testified to watching cartoons with the children as well as playing with radio controlled cars and wrestling with [the Child].

22

68. [Stepfather] has provided substantial support for [the Child] since 2006. For substantial periods of time, including the critical period from February, 2008 through August, 2009, [Stepfather] has provided the only financial support for [the Child].

69. [Stepfather] and [the Child] maintain a good relationship. Albeit inappropriately, [Mother] and [Stepfather] have encouraged [the Child] to refer to [Stepfather] as "daddy". [The Child] does perceive [Stepfather] to be his father and does not recognize [Father] to be his father. Testimony was provided that when [Father] referred to himself as "daddy" while speaking with [the Child] on the telephone, [the Child] fled from the phone.

70. Using photographs, [Stepfather] testified to various efforts of [the Child] to emulate [Stepfather]. [Stepfather] and [the Child] maintain a very close and loving relationship.

CONCLUSIONS

. . . .

37. The Court then proceeds to the "best interest" standard. Indiana Code 31-19-11-1(a)(1) requires that the adoption be in the best interest of the child.

. . . .

45. The material benefits that [the Child] has received come almost exclusively from [Stepfather]. [Stepfather] is a positive influence on [the Child's] life. He maintains a nurturing role in [the Child's] life. [The Child] and [Stepfather] maintain a loving relationship. [The Child] perceives [Stepfather] to be his father. From the evidence submitted, [the Child] is well adjusted and bonded to [Stepfather].

46. Conversely, [the Child] has no relationship with [Father]. As the Court has noted, [Mother] has acted to deny [Father] parenting time with [the Child] and to have [the Child] to perceive [Stepfather] as his father to the exclusion of [Father]. However, [Father] has also not taken steps to establish and to protect his rights. He did go to the Marion County Prosecutor's Office for the purpose of establishing a parenting time order. However, he then approved an agreement deferring the parenting time issue for future determination. He made no subsequent request of the Marion Circuit Court for a hearing to determine parenting time. Despite reduced income, a legal aid

23

attorney was not sought. [Father] did set aside One Thousand Dollars ($1,000.00) to obtain an attorney, but he says that he could not find an attorney to take his case. No evidence was made that he sought assistance from his family for an attorney, although his family has been receptive to providing assistance as demonstrated by their assistance in this proceeding. The fact that [Father] and [the Child] do not enjoy a relationship is as much due to [Father's] lack of effort in seeking to establish the relationship as [Mother's] effort in seeking to alienate [the Child] from [Father].

47. The Court finds by clear and convincing evidence that it is in [the Child's] best interest to grant [Stepfather's] Petition for Adoption. Accordingly, the Petition for Adoption filed by [Stepfather] is granted. The parental rights of [Father] are terminated.

. . . .

*Appellant's App.* at 20-35.

The trial court's findings are supported by the evidence and the findings, in turn, support the trial court's conclusions. The trial court noted that Mother had purposely acted in such a manner to alienate the Child from Father. Notwithstanding Mother's actions, Father did not actively pursue all avenues to enforce his rights as the Child's father. The Child has a good relationship with Stepfather and is nurtured by him. Father has admittedly subordinated support for the Child in favor of his own marijuana use. We cannot say that the evidence leads unerringly to a conclusion opposite to that reached by the trial court. The trial court did not err in granting the adoption petition based on the best interests of the Child.

Affirmed.

BARNES, J., and BRADFORD, J., concur.

24